Jennifer Sarnelli
**GARDY & NOTIS, LLP**
560 Sylvan Avenue, Suite 3085
Englewood Cliffs, New Jersey 07632
Telephone: 201-567-7377
Facsimile: 201-567-7337
Email:  jsarnelli@gardylaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIFFANY CHAN, JASMINE HENDERSON, and DON DANESH WIJESEKERA, Derivatively on Behalf of AKERS BIOSCIENCES, INC., | Case No.:  2:19-cv-4989 |
| Plaintiffs, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JOHN J. GORMALLY, GARY M. RAUCH, RAYMOND F. AKERS, JR., THOMAS KNOX, RICHARD C. TARBOX, III, BRANDON KNOX, ROBERT E. ANDREWS, RAZA BOKHARI, BILL J. WHITE, CHRISTOPHER C. SCHREIBER, and JOSHUA SILVERMAN, | |
| Defendants, | |
| -and- | |
| AKERS BIOSCIENCES, INC., | |
| Nominal Defendant. | |

Plaintiffs Tiffany Chan, Jasmine Henderson, and Don Danesh Wijesekera ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of nominal defendant Akers Biosciences, Inc. ("Akers" or the "Company"), submit this Verified Shareholder Derivative Complaint against the Individual Defendants (defined herein), current and former officers and/or directors of Akers, for breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs base their allegations on personal knowledge as to their own acts and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by Akers with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Akers; (iii) the facts alleged in two purported securities class action lawsuits filed in the United Stated District Court for the District of New Jersey against Akers and defendants John J. Gormally ("Gormally") and Gary M. Rauch ("Rauch") alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein;[1] and (iv) other publicly-available information, including media and analyst reports,

---

[1] The two cases have been consolidated under the caption *In re Akers Biosciences, Inc. Securities Litigation*, 18 Civ. 10521 (D.N.J.) (the "Securities Class Action").

concerning Akers.  Pursuant to Local Rule 10.1, the names and addresses of the

parties are as follows:

| **Plaintiffs** | **Defendants** |
|---|---|
| Tiffany Chan<br>15 Earl Goodyear Road<br>Markham, Ontario L6C 0T6 | Akers Biosciences, Inc.<br>201 Grove Road<br>Thorofare, NJ 08086<br>(Nominal Defendant) |
| Jasmine Henderson<br>12 Dylans Way<br>El Cerrito, CA 94530 | John J. Gormally<br>80 Walsh Drive<br>Mahwah, NJ 07430 |
| Don Danesh Wijesekera<br>59 Newcastle Dr.<br>Sarnia, ON N7S 0A6 | Gary M. Rauch<br>842 Saint Regis Court<br>Mantua, NJ 08051 |
| | Raymond F. Akers, Jr.<br>304 Alexander Ave<br>Cape May Point, NJ 08212 |
| | Thomas Knox<br>50 S 16th ST #4604<br>Philadelphia, PA 19102 |
| | Richard C. Tarbox, III<br>9325 E Casitas Del Rio Drive<br>Scottsdale, AZ 85255 |
| | Brandon Knox<br>771 Eagle Farm Road<br>Villanova, PA 19085 |
| | Robert E. Andrews<br>215 4th Ave.<br>Haddon Heights, NJ 08035 |

Raza Bokhari
3494 Progress Drive
Bensalem, PA 19020

Bill J. White
657 Lowell Road
Uniondale, NY 11553

Christopher C. Schreiber
258 Trinity Pass Road
Pound Ridge, NY 10576

Joshua Silverman
10a Timber Lane
Westport CT 06880-2621

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of Akers' current and former officers and members of the Company's Board of Directors (the "Board").   Plaintiffs seek to remedy the Individual Defendants' breaches of fiduciary duties and violations of state and federal laws from early 2016 to the present (the "Relevant Period"), which have caused and continue to cause substantial monetary damages to Akers and other damages, including damages to its reputation and goodwill.

2.     Akers is a New Jersey corporation founded in 1989 that develops, manufactures, and supplies rapid, point-of-care screening and testing products.  The Company specializes in single-use diagnostic tests in healthcare fields such as cardiology, emergency medicine, nutrition, diabetes, respiratory disease, and

infectious disease detection, as well as for on and off-the-job alcohol safety initiatives.

3.      For most of its history, Akers was a private company.  Since becoming a public company on January 23, 2014, Akers has experienced internal tumult, including operating without a Chief Executive Officer ("CEO") for almost two years.  The leadership void at Akers resulted in material weaknesses in the Company's controls related to segregation of duties and several areas of data management and documentation.  The Company has also suffered from significant accounting issues and the Individual Defendants have failed to adequately investigate or rectify these issues.

4.      When confronted with the Company's control issues, the Individual Defendants have taken steps to cover the issues up rather than finding and addressing the root cause.

5.      For instance, as described herein, Company co-founder, defendant Raymond F. Akers, Jr. ("Akers Jr."), refused to sign Akers' 2017 annual report and was subsequently stripped of his executive titles and then his directorship.  Akers Jr. sent a letter of disagreement to the Board and in subsequent correspondence claimed to be a whistleblower at the Company.  The remaining Board members never investigated his potential claims and/or his potential culpability and never released a public report of what had transpired.  Instead, they removed the Company's co-

founder and kept shareholders and the investing public in the dark as to what had occurred at the Company that caused it to restate its financial results and also caused multiple officers and directors to resign and/or not seek re-election.

6.     During the Relevant Period, rather than disclose the full extent of the accounting issues and weaknesses at the Company, the Individual Defendants caused or allowed Akers to issue or make materially false and misleading statements or omit material information concerning the Company's financial reporting relating to both its internal controls and revenue reporting, while at the same time reporting increases in revenue and positive product testing that gave the impression the Company was thriving.

7.     Specifically, on April 11, 2017, the Individual Defendants caused the Company to file a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC.  The 2016 10-K reported "a material weakness in [the Company's] controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation."   To explain these weaknesses, certain of the Individual Defendants stated that the Company's "management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists."  The Individual Defendants committed to hiring a Financial Controller in 2017 to improve the Company's "overall compliance with COSO[,]" while noting that "the control deficiencies result in a

reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls." Yet, the Individual Defendants also stated that they believed the risk of material misstatements in Akers' financial reporting were "minimal." On April 18, 2017, the Individual Defendants caused the Company to file an amended 2016 Form 10-K attaching an accountant's attestation to the financial statement.

8.     On the April 11, 2017 earnings call, the Company's Vice President of Finance, Treasurer, and Controller, defendant Rauch, reported a 40% increase in revenue for 2016, and the Company's co-founder, Executive Chairman, and Secretary, Akers Jr., added details about the results of product tests and data analysis. Neither mentioned the "material weaknesses" or the "other immaterial weaknesses in several areas of data management and documentation."

9.     In the Company's May 15, 2017 Form 10-Q for the first quarter of 2017, the Individual Defendants caused the Company to report falsely that "[t]here were no changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The Forms 10-Q for the second and third quarters of 2017 repeated this statement. All three quarterly reports were materially misleading because they withheld the truth about the Company's internal control weaknesses.

6

10.     On April 3, 2018, the Individual Defendants caused the Company to file a Form 12b-25, disclosing that the Company needed "additional time to gather information and finalize its financial statements" before filing its Form 10-K for the year ended December 31, 2017.  Oddly, the Individual Defendants then caused the Company to file its 2017 Form 10-K five minutes later (the "2017 10-K").  The 2017 10-K revealed that the Company had "identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation."  The 2017 10-K continued to report robust revenue figures for the fourth quarter and fiscal year 2017, without qualifying the figures.

11.     The 2017 10-K lacked an attestation from the Company's registered accounting firm regarding its financial statement and financial reporting controls and was not signed by defendant Akers Jr., even though he was a director.

12.     During the Company's earnings call on the same day, the Individual Defendants again misrepresented the Company's balance sheet and revenue statements.  Specifically, defendant Gormally misrepresented that: (a) in 2017 the Company had "strengthened [its] balance sheet with net proceeds from Public Offerings, [its] Private Placement and the conversion of warrants" which would "accelerate revenue growth in the months and years ahead;" and (b) the Company had "taken the necessary steps to strengthen [its] business across key areas" with the

7

ultimate goal to "materially accelerate the rate of revenue growth."  On the same call, defendant Rauch misled investors by stating that revenue figures were "up by a third," without qualification.

13.     On April 26, 2018, the Company announced that it had terminated defendant Akers Jr. from his positions as Executive Chairman of the Board, Chief Scientific Director, and Secretary.  Akers Jr. retained his seat on the Board.

14.     On May 16, 2018, the Individual Defendants caused the Company to disclose in a Form 12b-25 that it again needed additional time to review its finances, before filing its Form 10-Q for the first quarter of 2018, specifically needing to examine "certain revenue recognition items for this quarter."  As a result, on May 25, 2018, NASDAQ sent the Company a notice of delinquency regarding its first quarter 2018 Form 10-Q.

15.     On May 27, 2018, Akers Jr. resigned from the Board, and, on May 30, 2018, he sent a letter of disagreement to the Board citing "significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel."

16.     On June 1, 2018, the remaining Individual Defendants caused the Company to file a Form 8-K (the "June 1, 2018 8-K"), which stated that: (a) Akers Jr. disagreed with the Board as to the Audit Committee's review of "certain revenue recognition items with respect to the first quarter of 2018 as well as previous

quarters;" (b) Akers Jr. had resigned his directorship on May 27, 2018; (c) the delay in producing financial reports was due to a review of the revenue recognition items; and (d) Akers Jr. had "not been fully cooperative in connection with such review."

17.    Later on June 1, 2018, Akers Jr.'s attorney responded to the Company in a letter, which the Company disclosed in a June 5, 2018 amendment to the June 1, 2018 8-K.  The letter stated that: (a) the June 1, 2018 8-K contained "false, totally misleading" language; (b) Akers Jr. was actually a "whistleblower" at the Company; (c) Akers Jr.'s refusal to approve the 2017 10-K and his demand for an investigation were the sole reasons that the Company began to investigate revenue recognition issues; and (d) the Company was being "utterly disingenuious [sic]" by claiming Akers Jr. had been uncooperative.

18.    On June 19, 2018, the Individual Defendants caused the Company to file another Form 8-K, which disclosed that the Company's independent registered public accounting firm had advised the Board not to rely on previously filed financial statements contained in the 2017 10-K, as well as those contained in the Forms 10-Q for the second and third quarters of 2017.

19.    On July 13, 2018, the Individual Defendants caused the Company to file an amendment to the 2017 10-K (the "Amended 2017 10-K"), informing investors that the Board had formed a special committee after filing the 2017 10-K and engaged outside counsel and forensic accountants to investigate the Company's

9

financial statements.  The Amended 2017 10-K disclosed that the investigation identified "misstatements relevant to the Company's historical revenue recognition, expense accrual and inventory valuation policies and procedures" and that "[t]hese misstatements resulted in a material misstatement of the financial statements and required restatement of the financial statements included in the Company's Form 10-K for the fiscal year ended December 31, 2017 and in the Company's Forms 10-Q for the quarterly periods ended June 30, 2017 and September 30, 2017."  Further, the Amended 2017 10-K admitted that the misstatements "were not detected timely by management, were the result of inadequate design of controls pertaining to the Company's review and ongoing monitoring of its revenue recognition, expense accrual and inventory valuation policies" and that the "deficiency represents a material weakness in the Company's internal control over financial reporting."

20.    On October 5, 2018, defendant Gormally resigned from his positions as CEO and director, and on October 18, 2018, defendant Richard C. Tarbox, III ("Tarbox") resigned from his positions as interim Non-Executive Chairman of the Board, Secretary, and director.  The Board has operated since that time without a Chairman.

21.    Defendants Gormally, Rauch, Akers Jr., Thomas Knox ("T. Knox"), Tarbox, Brandon Knox ("B. Knox"), Robert E. Andrews ("Andrews"), Raza Bokhari ("Bokhari"), Bill J. White ("White"), Christopher C. Schreiber

("Schreiber"), and Joshua Silverman ("Silverman" and, collectively, the "Individual Defendants") breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein.

22. In addition, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by soliciting shareholder votes for director re-election and election, while simultaneously misrepresenting and/or failing to disclose that: (i) Akers improperly recognized revenue for the fiscal year 2017; (ii) Akers had serious weaknesses in its internal controls over financial reporting; and (iii) as a result, the Individual Defendants' statements about the business, operations, and prospects of the Company were materially false and misleading at all relevant times.

23. As a result of the foregoing breaches of fiduciary duty, the Company has sustained significant damages. The Company's stock price has dropped by over 96 percent due to the course of conduct described herein. The Company has also seen the departure of several key figures – each of whom was paid significant severance – and has been forced to bear the costs of finding replacements. In addition, the Company has been forced to defend against the Securities Class Action. The Company has also suffered damage to its reputation and goodwill as a result of the Individual Defendants' breaches of their fiduciary duties.

24.     On November 2, 2018, Plaintiffs each sent a litigation demand to the Board (the "Demands").  The Demands were received by the Board on November 5, 2018, but the Board did not respond for over two months.  On January 16, 2019, Plaintiffs sent a follow-up letter to the Board inquiring about the Board's review of the Demands, attaching copies of the Demands.

25.     Finally, on January 24, 2019, counsel for Akers sent Plaintiffs a letter that failed to address whether any investigation of the Demands had been commenced, but rather informed Plaintiffs that the Company had purportedly settled all of the claims from Plaintiffs' Demands with another purported shareholder, Cale Watts ("Watts"), who had filed a demand-excused shareholder derivative complaint on November 9, 2018, one week after the Demands were sent and four days after they had been received by the Board.[2]

26.     New Jersey law does not permit demand-excused derivative actions. *See* N.J.S.A. 14A:3-6.3, 6.9.  Because Watts lacked standing to bring a derivative action, his case was improperly brought and therefore had little to no chance of success.

27.     The current Board members – defendants White, Schreiber, and Silverman – breached their fiduciary duties by agreeing to a settlement with an

---

[2]  The Watts action is captioned, *Watts v. Gormally, et al.*, 18 Civ. 15992 (D.N.J.).

inadequate plaintiff instead of appropriately considering and investigating the Demands. If the settlement of the Watts action were to be approved, it would cause irreparable harm to the Company and its shareholders.

## JURISDICTION AND VENUE

28. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

29. The Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who resides in this District or has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

30. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and violation

of fiduciary duties owed to Akers occurred in this District, and/or defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

*Plaintiffs*

31.     Plaintiffs are current shareholders of Akers and have continuously held Akers common stock at all relevant times.

*Nominal Defendant Akers*

32.     Akers is a New Jersey corporation with its principal executive offices at 201 Grove Road, Thorofare, New Jersey 08086.  The Company's common stock trades on the NASDAQ Capital Market under the ticker symbol "AKER."

*The Individual Defendants*

33.     Gormally was appointed as the Company's CEO in November 2015. Gormally also served as a director beginning on August 7, 2017 until his resignation from both positions on October 5, 2018.  Gormally's compensation for fiscal year 2016 totaled $311,025, comprised of $248,500 in salary, $54,725 in stock awards, and $7,800 in other compensation.  In fiscal year 2017, Gormally's compensation totaled $511,915, comprised of $322,115 in salary, $132,000 in stock awards, a $50,000 cash bonus, and $7,800 in all other compensation.  As of July 7, 2017, Gormally beneficially owned 0.34% of the Company's common stock, worth

approximately $36,000, based on the price of Akers common stock on that date. The Company issued defendant Gormally an additional 150,000 restricted stock units on October 17, 2017, with a value of approximately $158,400.

34. Rauch has been the Company's Vice President of Finance since March 2010 and Treasurer since August 5, 2013. He has also been the Company's controller since March 2010. Rauch's compensation for fiscal year 2016 was $95,000. Rauch's compensation for fiscal year 2017 was $161,855, comprised of $111,031 in salary, $31,924 in stock awards, and an $18,900 cash bonus. As of April 5, 2017, Rauch beneficially owned 0.48% of Akers' common stock. Defendant Rauch received an additional 36,277 restricted shares of Akers common stock on October 17, 2017.

35. Akers Jr. founded the Company in 1989 and was Executive Chairman of the Board from December 2009 until April 2016. Akers Jr. was subsequently appointed Chief Scientific Director and continued to serve as a director. Akers Jr. also served as the Company's Secretary beginning in August 2013. On August 10, 2017, Akers Jr. was again appointed Executive Chairman of the Board, a position which he retained until he was removed as Executive Chairman, Chief Scientific Director, and Secretary on April 26, 2018. He remained a director until his resignation from the Board on May 27, 2018. Akers Jr.'s compensation for fiscal year 2016 totaled $277,031, of which $269,231 was salary and $7,800 was all other

compensation.   In fiscal year 2017, Akers Jr. received a total of $296,262 in compensation, of which $288,642 was salary and $7,800 was all other compensation.  As of April 5, 2017, Akers Jr. beneficially owned 1.27% of Akers' common stock.

36.     T. Knox was a director of Akers from July 1, 2013 until August 7, 2017, when he did not seek re-election to the Board.  He was also the Non-Executive Chairman of the Board from April 2016 until August 7, 2017.  T. Knox was Chairman of the Audit Committee and a member of the Compensation and Nominating and Corporate Governance Committees.  As of April 5, 2017, T. Knox beneficially owned 5.63% of Akers' common stock.

37.     Tarbox was a director of Akers from August 2017 until his resignation on October 18, 2018.  Tarbox was a member of the Audit, Compensation, and Nominating and Corporate Governance Committees.  Tarbox also briefly served as the Company's interim Non-Executive Chairman between April 25, 2018 and October 18, 2018.

38.     B. Knox was a director of Akers from January 23, 2014 until August 7, 2017, when he did not seek re-election to the Board.  B. Knox was a member of the Compensation and Audit Committees and acted as Chairman of the Nominating and Corporate Governance Committee.  As of April 5, 2017, B. Knox beneficially owned 1.63% of Akers' common stock.

39.     Andrews was a director of Akers from June 29, 2015 until August 7, 2017, when he did not seek re-election to the Board.  Andrews served on the Audit and Nominating and Corporate Governance Committees and acted as Chairman of the Compensation Committee.  As of April 5, 2017, Andrews beneficially owned 0.54% of Akers' common stock.

40.     Bokhari was a director of Akers from November 11, 2015 until August 2017, when he did not seek re-election to the Board.  Bokhari served on the Audit, Compensation, and Nominating and Corporate Governance Committees.  As of April 5, 2017, Bokhari beneficially owned 0.36% of Akers' common stock.

41.     White has been a non-executive director of Akers since August 7, 2017 and is the Chairman of the Audit Committee.  White is also a member of the Compensation and Nominating and Corporate Governance Committees.

42.     Schreiber has been a non-executive director of Akers since August 7, 2017 and is the Chairman of the Compensation Committee.  Schreiber is also a member of the Audit and Nominating and Corporate Governance Committees.

43.     Silverman has been a non-executive director of Akers since September 6, 2018.  He is a member of the Audit, Compensation, and Nominating and Corporate Governance Committees.

44.    Gormally, Rauch, Akers Jr., R. Knox, Tarbox, B. Knox, Andrews, Bokhari, White, Schreiber, and Silverman are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

45.    By reason of their positions as officers and/or directors of Akers and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its shareholders the fiduciary obligations of good faith, loyalty, due care, disclosure, oversight and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

46.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, directly and/or indirectly exercised control over the wrongful acts complained of herein, as well as the

contents of various public statements issued by the Company.  Because of their advisory, executive, managerial, and/or directorial positions within Akers, each of the Individual Defendants has access to adverse, nonpublic information about the Company's discount programs and promotions, financial condition, operations, and improper representations of Akers.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Akers and was at all times acting within the course and scope of such agency.

48.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Akers were required to, among other things:

a.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

49.     Each of the Individual Defendants, as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable

20

violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SPECIFIC CORPORATE GOVERNANCE
## RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

50.     The Company has a Code of Ethics that delineates further duties of its Board members, executives, and other employees.  According to the Code of Ethics:

> It is the policy of Akers Biosciences, Inc. that the Company's Board of Directors, Chief Executive Officer, Chief Financial Officer, principal accounting officer or controller (or persons performing similar functions) and all employees adhere to, advocate and promote the following principles:
>
> 1.     Loyalty to the interests of our shareholders, customers, suppliers, fellow employees, strategic partners and other business associates;
>
> 2.     Honest and ethical conduct in any action, practice or course of conduct within the Company or with its business partners;
>
> 3.     Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> 4.     Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission (the "SEC" or "Commission") and other public communications made by the Company; and
>
> 5.     Compliance with laws, rules and regulations applicable to the Company

51.     The Code of Ethics also requires the following from Company directors and officers:

> Insiders (directors, officers and employees of the Company) shall maintain a high degree of integrity in the conduct of the Company's business and maintain independent judgment. Each insider must avoid any activity or personal interest that creates, or reasonably appears to create, a conflict between his/her interests and the interests of the Company.

> *          *          *

> Insiders and their family members must not profit, directly or indirectly, due to their position in the Company to the detriment, or at the expense, of the Company or any of its business associates. No insider shall take for his or her own advantage any business opportunity for profit, which he or she learns about as a result of his or her position with the Company.

52.     The Code of Ethics clearly outlined the scope of the Individual Defendants' duties.  However, the Individual Defendants violated the code by failing to maintain adequate financial controls and causing the Company to issue materially false and misleading financial statements, including a materially false and misleading proxy statement, in violation of Section 14(a) of the Exchange Act.

### *Additional Duties of the Audit Committee*

53.     One of the Board's designated committees is the Audit Committee.  The Audit Committee Charter describes its purpose as well as the duties of its members.  The Audit Committee Charter states, in relevant part:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Akers Biosciences, Inc. ("Akers" or the

"Company") is to oversee the processes of accounting and financial reporting of the Company and the audits and financial statements of the Company. The Committee's primary duties and responsibilities are to:

A.  Monitor the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance.

B.  Monitor the independence and performance of the Company's independent auditors and the Company's accounting personnel.

C.  Provide an avenue of communication among the independent auditors, management, the Company's accounting personnel, and the Board.

D.  Appoint and provide oversight for the independent auditors engaged to perform the audit of the financial statements.

E.  Discuss the scope of the independent auditors' examination.

F.  Review the financial statements and the independent auditors' report.

G.  Review areas of potential significant financial risk to the Company.

H.  Monitor compliance with legal and regulatory requirements.

I.  Solicit recommendations from the independent auditors regarding internal controls and other matters.

J.  Make recommendations to the Board.

K.  Resolve any disagreements between management and the auditors regarding financial reporting.

L.  Prepare the report required by Item 407(d) of Regulation S-K, as required by the rules of the Securities and Exchange Commission (the "SEC").

M.  Perform other related tasks as requested by the Board.

> The committee has the authority to conduct any investigation appropriate to fulfilling its responsibilities, and it has direct access to the independent auditors as well as anyone in the organization. The Committee has the ability to retain, at the Company's expense, special legal, accounting, or other consultants or experts it deems necessary in the performance of its duties.

54.     Defendants T. Knox, B. Knox, Andrews, Bokhari, White, Tarbox, and Schreiber failed to uphold their duties as members of the Audit Committee.  The Company was allowed to operate with materially deficient internal controls and suffered from improper revenue recognition and other accounting irregularities as a result.

### Additional Duties of the Compensation Committee

55.     Another of the Board's designated committees is the Compensation Committee.  The charter of the Compensation Committee describes its purpose as well as the specific duties and responsibilities of its members.  The Compensation Committee's Charter states in pertinent part:

> The primary purposes of the Committee are to: (i) develop recommendations for the Board with respect to the compensation of the Company's Chief Executive Officer (the "CEO") and non-employee directors; (ii) discharge the responsibilities of the Board relating to the approval of the compensation of the Company's executive officers, other than the CEO; (iii) make determinations with respect to the compensation programs and policies of the Company; (iv) review and discuss with the Company's management, the Compensation Discussion and Analysis (the "CD&A") and other Committee or executive compensation disclosures to be included in the Company's annual proxy statement and/or annual report on Form 10-K, and determine whether to recommend to the Board of Directors that the CD&A be included in the proxy statement and/or annual report on Form

10-K; and (v) provide the Compensation Committee Report for inclusion in the Company's annual proxy statement and/or annual report on Form 10-K that complies with the rules and regulations of the Securities and Exchange Commission (the "SEC").

56. The Compensation Committee's responsibilities and duties include the following:

A. The Committee shall annually review goals and objectives relevant to the CEO's compensation, evaluate the CEO's performance in light of those goals and objectives, determine the CEO's cash and equity-based compensation based on this evaluation, and recommend such goals, objectives and compensation to the Board for its approval. In determining any incentive component of the CEO's compensation, the Committee will consider appropriate factors, which may include the Company's performance and relative shareholder return, the achievement of the CEO's performance milestones, the value of similar incentive grants or awards to chief executive officers at comparable companies, and the grants or awards given to the CEO in past years. The CEO may not be present for such discussions and determinations.

B. The Committee shall annually review and approve the compensation of the Company's "executive officers," (as that term is defined in the regulations promulgated by the SEC and the NASDAQ Rules) other than the CEO. In making such compensation decisions, the Committee will take into account peer group practices and other appropriate factors, such as corporate and individual performance and historical compensation practices for such officers. The Committee will solicit the recommendations of the CEO in connection with the foregoing. The Committee will also provide general oversight of the Company's compensation and benefits plans, policies and programs that pertain to employees other than executive officers.

C. The Committee shall annually review and recommend to the Board for its approval, the fees and equity compensation paid to the Company's non-employee directors, based on appropriate

factors as determined by the Committee. Such review and recommendations shall ensure that no agreements or arrangements for providing professional or consulting services to the Company or an affiliate or an individual officer of the Company or one of their affiliates are made with any director, immediate family members of a director or persons (including entities) with an existing business or personal relationship with any director, without a full review and evaluation of potential conflicts of interest.

D.   The Committee shall have the sole authority to retain and terminate any compensation consultant to be used by the Committee or the Company to assist in the evaluation of the compensation of non-employee directors, the CEO or the other executive officers, shall have sole authority to approve such compensation consultant's fees and other retention terms, and shall have sole authority to oversee the work of such compensation consultant. In determining whether to engage a compensation consultant, the Committee shall consider the independence factors set forth in the NASDAQ Corporate Governance Rules. Management will advise the Committee of any compensation consultant to be retained with respect to other compensation matters in advance of such retention.

E.   The Committee shall periodically review and make recommendations to the Board with respect to incentive-compensation programs and equity-based plans, and shall periodically review and make recommendations to the Board with respect to the adoption of or material changes in material employee benefit, bonus, severance and other compensation plans of the Company. As appropriate in connection with this process, the Committee shall seek appropriate input from internal or external advisors.

F.   The Committee shall determine the need for and the appropriateness of employment agreements and change in control agreements for each of the Company's executive officers and any other officers recommended by the CEO or the Board.

G.    The Committee shall determine and approve the options and other equity-based compensation to be granted to executive officers, other than the CEO; and shall recommend to the Board for approval options and other equity-based compensation to be granted to the CEO and non-employee directors. The Committee shall, in conjunction with the CEO, determine the issuance of options and other equity-based compensation under the Company's incentive compensation and other stock-based plans to all other officers and employees of the Company. The Committee may delegate the determination with respect to persons other than officers to the CEO but will approve the aggregate amount granted to all employees and all new hire grants. Any equity awards to the CEO shall be determined by the Committee and recommended to the Board for its review and approval.

H.    The Committee shall perform such duties and responsibilities as may be assigned to the Committee by the Board and/or under the terms of any compensation plan of the Company.

57.    The Individual Defendants failed to maintain the standards laid out by the law and the Company itself, resulting in the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

58.    Akers is a New Jersey corporation, founded in 1989, that develops, manufactures, and supplies rapid, point-of-care screening and testing products. The Company specializes in single-use diagnostic tests in healthcare fields such as cardiology, emergency medicine, nutrition, diabetes, respiratory disease, and infectious disease detection, as well as for on- and off-the-job alcohol safety

initiatives.  All of Akers' rapid, single-use tests are performed *in vitro* (outside the body) and are designed to enhance patient well-being and reduce total outcome costs of healthcare.  The Company's products focus on delivering diagnostic assistance in a wide variety of healthcare fields and specialties.

59.     Akers has suffered from management turn-over since becoming a public company on January 23, 2014.  On March 7, 2014, less than three months after the Company's initial public offering, the Company's CEO, Thomas A. Nicolette, resigned effective March 28, 2014.  His letter of resignation stated that his "resignation is not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices."

60.     The Company then operated without a CEO or President for almost twenty-one months[3] until December 2, 2015, when defendant Gormally was appointed CEO.  Gormally had no prior experience as a CEO.  According to the Company's 2017 Proxy Statement, filed with the SEC on Form 14A on July 24, 2017 (the "2017 Proxy"), at that time defendant Gormally was "currently an MBA candidate at Northeastern University."

---

[3]  Akers' SEC filings during this period show that Akers operated without a CEO, but news accounts state that Akers Jr. was the CEO during this time.  For example: https://www.bizjournals.com/philadelphia/news/2018/10/08/akers-biosciences-ceo-gormally-yeaton-breathscan.html.

61.     On April 22, 2016, defendant Akers Jr. resigned from his positions as Executive Chairman and Co-Chairman of the Board.  Akers Jr. continued to serve as a director and was appointed as "Co-Founder/Chief Scientific Director of the Company."  This new position entitled him to a $200,000 annual base salary and performance-based bonuses at the Board's discretion.

**B.     Significant Accounting Issues at Akers**

62.     On March 31, 2017, the Individual Defendants caused Akers to file a Form 12b-25 – Notification of Late Filing with the SEC informing shareholders and the investing public that the Company would be unable to file timely the 2016 10-K.

63.     The Company eventually filed the 2016 10-K on April 11, 2017.  The 2016 10-K revealed that there was "a material weakness in [the Company's] controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation."  The Company attempted to explain the weakness by stating that its "management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists."

64.     The 2016 10-K also revealed that the Company may have violated Section 402 of the Sarbanes-Oxley Act of 2002, which prohibits an issuer from extending or maintaining personal loans to its directors or executive officers.

According to the 2016 10-K, Akers entered into such an agreement with defendant T. Knox, and Akers' counsel notified the Individual Defendants that this could subject the Company to criminal, civil, or administrative sanctions, as well as potential private securities litigation.

65.     The Individual Defendants attempted to assuage any possible shareholder concern over the Company's weaknesses by stating that it had committed to hiring a Financial Controller in 2017 to improve its "overall compliance with COSO[,]" while noting that "the control deficiencies result in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls."  However, the Individual Defendants stated that the material weakness was "intrinsic to our small size" and they believed the risk of material misstatements in the Company's financial reporting was "minimal."

66.     The 2016 10-K went on to state that "[t]here were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

67.     During the Company's April 11, 2017 earnings conference call, defendant Rauch was positive about the Company's prospects and reported a 40%

increase in revenue in 2016.  Defendant Akers Jr. highlighted the results of product tests and data analysis, but neither defendant mentioned or provided details about the "material weaknesses" or the "other immaterial weaknesses in several areas of data management and documentation."

68.    On April 18, 2017, the Company filed an amended 2016 10-K attaching an accountant's attestation to the financial statement.

69.    On May 15, 2017, in the Company's Form 10-Q for the first quarter of 2017, the Individual Defendants caused the Company to falsely report that "[t]here were no changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."  The Individual Defendants caused the Company to issue a press release announcing Akers' first quarter 2017 earnings on May 16, 2017.  The press release stated that the Company had quarterly revenue of $667,250.

70.    The Individual Defendants caused the Company to file its 2017 Proxy with the SEC on Form 14A on July 24, 2017.  The 2017 Proxy revealed that all outside directors of the Board had decided not to seek re-election at the 2017 Annual Shareholder Meeting.  As a result, Akers Jr. would be the only remaining Board member.  Defendants T. Knox, B. Knox, Andrews, and Bokhari each participated in the earlier accounting irregularities and chose not to seek re-election.  Defendants

31

Gormally, White, Tarbox, and Schreiber were chosen as new director nominees. Defendants White, Tarbox, and Schreiber were nominated as purportedly independent directors. Defendants Gormally, White, Tarbox, and Schreiber all won election to the Board and Akers Jr. was re-elected to the Board at the August 7, 2017 Annual Meeting.

71.     Akers is required under New Jersey law to hold an annual meeting of shareholders a minimum of once every thirteen months.  In violation of New Jersey Revised Statutes Section 14A:5-2, Akers did not hold another annual meeting until December 7, 2018, sixteen months after  the August 7, 2017 meeting.

72.     Only four days before the August 7, 2017 Annual Shareholder Meeting, the Individual Defendants caused Akers to issue a press release touting the Company's financial performance in the second quarter of 2017.  According to the press release, "sales in the second quarter ended June 30, 2017 were among the strongest since the Company's admission to NASDAQ Capital Market in 2014.  The Company recorded revenues of approximately $1.2 million over the three-month period, representing an increase of approximately 25 percent over the second quarter of 2016, and a 1.8 times increase over the first quarter of 2017."  The press release unmistakably gave the impression that Akers' financial position was vibrant and stable.

73.   On August 14, 2017, the Individual Defendants caused Akers to file a Form 10-Q for the second quarter of 2017 which repeated the claim that there were no changes in the Company's internal controls over financial reporting.  During a conference call held with analysts and investors on August 15, 2017, defendant Gormally discussed the Company's second quarter 2017 financial results in highly positive terms, stating that the Company's "campaign of growing towards profitability continued in 2Q with increases of 25% in total revenues to approximately $1.2 million and growth of 10% for the first half of 2017 to approximately $1.9 million in sales."  The press release issued by the Company on the same day echoed Gormally's enthusiasm about the Company's revenue and positive financial outlook.

74.   On November 14, 2017, the Individual Defendants caused Akers to file a Form 10-Q for the third quarter of 2017 which once again repeated the claim that there were no changes in the Company's internal controls over financial reporting. Akers held a conference call with analysts and investors the next day during which defendant Gormally stated that "both 3Q and year-to-date revenues were up 10% and our gross profit year-to-date was up 6% demonstrating the continued positive trajectory towards profitability."

75.    Also on November 15, 2017, the Individual Defendants caused the

Company to issue a press release with an unambiguously positive message.  In the

press release, defendant Gormally stated:

> Total Revenues were up by 10% in the third quarter as increasing sales of the Company's breathalyzer products and rapid cholesterol tests complemented the robust, albeit plateaued, core revenues from our flagship rapid test for heparin-induced thrombocytopenia (HIT).

> The Company is not satisfied with the plateau in sales of rapid HIT tests, which were broadly flat in the US during the third quarter, and is actively campaigning to drive future growth by pursuing further clinical pathway studies, heparin-induced thrombocytopenia (HIT) awareness campaigns and a strategic focus on surgeons who are central to any decision to test for heparin platelet factor 4 antibodies.

> We continue to anticipate strong growth from this core product as a result of these initiatives and of our strategy to market to large integrated delivery network customers in the US.  While these have a longer sales cycle attached, we believe they will ultimately deliver higher quality revenues over the long-term than individual hospital purchasers.  Additionally, we believe sales in China will materialize when NovoTek Pharmaceuticals ("NovoTek"), our distribution partner for the PIFA Heparin/PF4 Rapid Assay products in China, gains approvals for reimbursement rates from the various Provinces. Over the past several years, NovoTek has created significant product demand by identifying and working with the key opinion leaders and seeding the marketplace with sample products.  As a result, they anticipate strong demand once reimbursement rates are approved, albeit the timing remains unknown.

> Akers Bio recorded a 22% increase in breathalyzer product sales in the third quarter, driven by growing sales of BreathScan OxiChek™ cartridges and BreathScan Lync™ readers from the Akers Wellness line; as well as BreathScan® Alcohol Detector sales, which are beginning to pick up in Western Europe, Australia and East Asia. The Company expects this trend to continue as the distribution partners in these areas continue to expand their markets.

Notably, during August 2017, the Company received a non-refundable
license fee from a potential customer for BreathScan OxiChek™ in
exchange for the use of equipment, access to product documentation
and data, technical support and to temporarily restrict the Company
from actively pursuing another commercial partner for BreathScan
OxiChek™ in a specific market segment.  We look forward to reporting
further progress as the commercialization of this test – aimed at the
significant health and wellness market – continues to gain traction.

76.     The press release was also optimistic with respect to the Company's

outlook:

Our year to date picture is an encouraging one overall which shows
revenues tracking a 10% increase over 2016 and with cash burn
shrinking (save for extraordinary legal expenses).  There are a number
of individual potential catalysts – such as the conversion of our
integrated delivery network strategy in the US, the China opportunity
and exciting projects ongoing with BreathScan OxiChek™ - which
could take the Company into profitability in the near term.  In addition,
the Company remains excited about the introduction of several new
products targeted for introduction in 2018 which we believe will further
enhance sales growth potential.

77.     The Company's annual report on Form 10-K for the year ended

December 31, 2017 was due to be filed with the SEC on April 2, 2018.  On April 3,

2018, the Individual Defendants caused the Company to file another Form 12b-25 –

Notification of Late Filing with the SEC disclosing that the Company again would

not be filing its annual report on Form 10-K on time because Akers needed

"additional time to gather information and finalize its financial statements."

78.    Just five minutes after filing the Form 12b-25,[4] the Individual Defendants caused the Company to file its 2017 10-K.  The 2017 10-K revealed the same issues as the 2016 10-K, specifically, that the Individual Defendants "identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation" – an issue that had not been disclosed in any financial statements in the interim.  The 2017 10-K also lacked an attestation from the Company's registered accounting firm regarding its financial statements and financial reporting controls.  The 2017 10-K continued to report robust revenue figures, specifically a revenue increase of 33% compared to 2016.

79.    Notably, the 2017 10-K was not signed by defendant Akers Jr. even though he was a director of the Company.  All of the other directors signed the 2017 10-K.

80.    On April 3, 2018, during the Company's earnings conference call, the Individual Defendants continued to materially misrepresent the Company's balance sheet and revenue statements.  Specifically, defendant Gormally misrepresented that:  (a) in 2017 the Company had "strengthened [its] balance sheet with net proceeds from Public Offerings, [its] Private Placement and the conversion of

---

[4] According to the SEC's Edgar database, the Form 12b-25 was filed at 6:02:44 and the Form 10-K was filed at 6:07:56, both on April 3, 2018.

warrants" which would "accelerate revenue growth in the months and years ahead;" and (b) the Company had "taken the necessary steps to strengthen [its] business across key areas" with the ultimate goal to "materially accelerate the rate of revenue growth." On the same call, defendant Rauch misled shareholders and the investing public by stating that revenue figures were "up by a third" without providing specific details.

81.    On April 3, 2018, the Individual Defendants caused the Company to issue a press release reporting the financial results highlighted during the conference call. The press release quoted defendant Gormally as stating:

> Akers Bio grew stronger in 2017 on a number of levels. We strengthened our Board of Directors, with the appointments of highly experienced directors in the fields of healthcare, medical devices, finance and capital markets; we strengthened our leadership team, particularly in Sales and Distribution; we strengthened our product positioning across core products including PIFA Heparin/PF4 Rapid Assay and BreathScan OxiChek™; and we strengthened our balance sheet, with net proceeds from Public Offerings a Private Placement and the executions of stock warrants totaling approximately $10.5 million. The combined effect of these accomplishments will, I believe, be reflected in accelerated growth in the months and years ahead.

82.    With respect to revenue, the press release stated:

> The Company's total revenue for the year ended December 31, 2017 was $3,929,527, a 33% increase compared to the same period in 2016. Product revenue increased by 31% to $3,879,527 (2016: $2,957,162) during the year ended December 31, 2017 driven primarily by sales of BreathScan Alcohol Breathalyzers, BreathScan OxiChek™ and the Company's re-introduced Tri-Cholesterol products.

\*       \*       \*

37

The Company continues to maintain strong gross margins which remained unchanged at 63% for the years ended December 31, 2017 and 2016.

83.     The Individual Defendants repeatedly failed to disclose the extent of the material weaknesses in the Company's internal controls and the effect that could have on Akers' financial prospects.

## C.     The Individual Defendants Fail to Adequately Investigate the Company's Internal Control Deficiencies

84.     On April 26, 2018, the Company suddenly announced that it had terminated Akers Jr. from his positions as Executive Chairman of the Board, Chief Scientific Director, and Secretary.  Akers Jr. retained his seat on the Board.  No further explanation was given as to why Akers Jr. had been removed from his executive and leadership positions.  Defendant Tarbox replaced Akers Jr. as interim Non-Executive Chairman of the Board.

85.     On May 16, 2018, the Individual Defendants again caused the Company to file a Form 12b-25 – Notification of Late Filing with the SEC, this time regarding the first quarter 2018 Form 10-Q.  The Form 12b-25 stated that "[t]he Company requires additional time to review the characterization of certain revenue recognition items for this quarter and for the auditors to complete their pre-filing procedures and finalize its financial statements."

86.     As a result, on May 25, 2018, NASDAQ sent the Company a notice of delinquency regarding its first quarter 2018 Form 10-Q.

87.     On May 27, 2018, Akers Jr. resigned from the Board, and on May 30, 2018, he sent a letter of disagreement to the Board, citing "significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel."

88.     The remaining Individual Defendants responded to Akers Jr.'s letter on June 1, 2018 in the June 1, 2018 8-K, which stated that: (a) Akers Jr. disagreed with the Board as to the Audit Committee's review of "certain revenue recognition items with respect to the first quarter of 2018 as well as previous quarters"; (b) Akers Jr. had resigned his directorship on May 27, 2018; (c) the delay in producing financial reports was due to a review of the revenue recognition items; and (d) Akers Jr. had "not been fully cooperative in connection with such review."

89.     Later on June 1, 2018, Akers Jr.'s attorney responded to the other Individual Defendants in a letter, which the Company disclosed in a June 5, 2018 amendment to the June 1, 2018 8-K. The letter stated that: (a) the June 1, 2018 8-K contained "false, totally misleading" language; (b) Akers Jr. was actually a "whistleblower" at the Company; (c) Akers Jr.'s refusal to approve the 2017 10-K and his demand for an investigation were the sole reasons that the Company began to investigate revenue recognition issues; and (d) the Company was being "utterly disingenuious [sic]" by claiming Akers Jr. had been uncooperative.

90.    Although the SEC and the investing public were notified of this correspondence, the Company did not reveal any substantive details about defendant Akers Jr.'s departure from the Company or the precise nature of the disagreements surrounding the accounting and business practices of management.

91.    On June 19, 2018, the remaining Individual Defendants caused the Company to file another Form 8-K, which disclosed that the Company's independent registered public accounting firm had advised the Board not to rely on previously filed financial statements contained in the 2017 10-K, as well as those contained in the Forms 10-Q for the second and third quarters of 2017.  The Form 8-K stated, in relevant part:

> On June 18, 2018, the Audit Committee of the Board of Directors (the "Audit Committee") was advised by the Company's independent registered public accounting firm, Morison Cogen LLP ("Morison"), that the following previously filed financial statements of the Company should not be relied upon:
>
> (i)    The Company's audited consolidated financial statements for the fiscal year ended December 31, 2017, contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, originally filed with the Securities and Exchange Commission ("SEC") on April 3, 2018 (the "Annual Report"),
>
> (ii)   The Company's unaudited financial statement for the quarterly period ended September 30, 2017, contained in the Company's Quarterly Report on Form 10-Q, originally filed with the SEC on November 14, 2017 (the "Q3 Report"); and
>
> (iii)  The Company's unaudited financial statement for the quarterly period ended June 30, 2017, contained in the Company's

40

Quarterly Report on Form 10-Q, originally filed with the SEC on August 14, 2017 (the "Q2 Report", which along with the Q3 Report and the Annual Report are referred to herein as the "Reports").

Subsequent to the filing of the Annual Report certain information came to the attention of the Audit Committee that certain 2017 revenue transactions did not qualify for revenue recognition under generally accepted accounting principles. The Audit Committee is overseeing an investigation of these matters with assistance of Morison, outside counsel and forensic accountants.

The Company will, as soon as is practicable, make the appropriate adjustments to the above referenced Reports by filing with the SEC amendments to the Reports which, in each case, will include restated consolidated financial statements and notes thereto and any other appropriate revisions.

92.    This revelation was completely at odds with the previous SEC filings of the Company as well as the statements made to the public by defendants Gormally and Rauch.

93.    On July 13, 2018, the remaining Individual Defendants caused the Company to file an amendment to the 2017 10-K informing shareholders and the investing public that the Board had formed a special committee after the filing of the 2017 10-K on April 3, 2018 and engaged outside counsel and forensic accountants to investigate the Company's financial statements. The Amended 2017 10-K disclosed that the investigation identified "misstatements relevant to the Company's historical revenue recognition, expense accrual and inventory valuation policies and procedures" and that "[t]hese misstatements resulted in a material misstatement of

41

the financial statements and required restatement of the financial statements included in the Company's Form 10-K for the fiscal year ended December 31, 2017 and in the Company's Forms 10-Q for the quarterly periods ended June 30, 2017 and September 30, 2017." Further, the Amended 2017 10-K admitted that the misstatements "were not detected timely by management, were the result of inadequate design of controls pertaining to the Company's review and ongoing monitoring of its revenue recognition, expense accrual and inventory valuation policies" and that the "deficiency represents a material weakness in Company's internal control over financial reporting."

94. On October 5, 2018, defendant Gormally resigned from his positions as CEO and director. The remaining Individual Defendants caused the Company to state that the resignation was "voluntary and for health reasons and not a result of any disagreement with the Company or its executive officers on any matter relating to the Company's operations, policies or practices." The remaining Individual Defendants also caused the Company to pay Gormally a resignation bonus package consisting of a cash payment of $100,000 and 27,500 shares of restricted stock that were previously issued to him but had not fully vested. Gormally was replaced by Howard R. Yeaton on October 8, 2018, who has purportedly served as a consultant to the Company since April 2018.

95.     On October 18, 2018, defendant Tarbox resigned from his positions as interim Non-Executive Chairman of the Board, Secretary, and director.  He was a member of the Board for just over a year and was initially brought in as one of the new purportedly independent directors.

96.     Shortly thereafter, on November 7, 2018, the remaining Individual Defendants – Rauch, White, and Schreiber – caused the Company to announce that it had initiated a process to evaluate strategic alternatives to maximize shareholder value.

97.     On November 19, 2018, the remaining Individual Defendants caused the Company to state, without any supporting facts, that it may be entering the cannabis industry.  This resulted in a fleeting uptick in stock price, but provided no actual benefit to the Company and merely served to distract from its deep-rooted problems.

98.     The value of Akers' common stock has declined dramatically over the past two years.  The Company's co-founder, Akers Jr., was forced out – potentially as a result of blowing the whistle on the other Individual Defendants' conduct.  Furthermore, all executives except Rauch have been replaced and only White and Schreiber remain as directors – the current Board has only three members and no Chairman.  The internal turmoil at Akers' has impeded the Company's ability to

successfully carry out its business as evidenced by the decline in Akers' market capitalization.  The Company's instability has degraded Akers' goodwill.

99.    The Individual Defendants have refused to investigate and ameliorate the Company's deficient internal controls and have instead acted to avoid any investigation of the wrongdoing.   Despite receiving Plaintiffs' Demands to investigate potential wrongdoing at the Company, the Individual Defendants have refused to do so.

**D.    Certain of The Individual Defendants Issued a Materially False and Misleading Proxy Statement**

100.   Certain of the Individual Defendants also caused the Company to issue a false and misleading proxy statement, which sought shareholder votes for, *inter alia*, the election of directors.

101.   On July 24, 2017, defendants Akers, Jr., Gormally, T. Knox, B. Knox, Andrews, and Bokhari caused the Company to file with the SEC and disseminate to shareholders the 2017 Proxy in connection with the Company's annual shareholder meeting.  These Individual Defendants drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to Akers' shareholders.  These Individual Defendants negligently issued materially misleading statements and omitted material information in the 2017 Proxy.  The 2017 Proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and

they do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2017 Proxy allegations and related claims.

102.    Among other things, the 2017 Proxy provided information about the director nominees up for election, which included the re-election of defendant Akers Jr. and the election of defendants Gormally, White, Tarbox, and Schreiber.   In addition, the 2017 Proxy described director responsibilities; the duties of each committee; general Board risk oversight; oversight of the Company's financial statements; the accuracy of the Company's 2016 financial statements; and explicitly referenced the Code of Ethics, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

103. Specifically, the 2017 Proxy described the Board's corporate governance as follows:

> The ***Board oversees our business affairs and monitors the performance of our management***. In accordance with our corporate governance principles, the Board does not involve itself in day-to-day operations.   ***The directors keep themselves informed through discussions with the Chief Executive Officer, Chief Scientific Director, other key executives, and by reading the reports and other materials sent to them and by participating in Board and committee meetings.***

(Emphasis added).

104.   According to the 2017 Proxy, the Audit Committee's duties are as follows:

> ***The Audit Committee oversees our accounting and financial reporting processes and oversees the audit of our financial statements and the effectiveness of our internal control over financial reporting.*** The specific functions of the Audit Committee include, but are not limited to:
>
> - selecting and recommending to the Board the appointment of an independent registered public accounting firm and overseeing the engagement of such firm;
>
> - approving the fees to be paid to the independent registered public accounting firm;
>
> - helping to ensure the independence of the independent registered public accounting firm;
>
> - ***overseeing the integrity of our financial statements;***
>
> - ***preparing an audit committee report as required by the SEC to be included in our annual proxy statement;***
>
> - ***resolving any disagreements between management and the auditors regarding financial reporting;***
>
> - ***reviewing with management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies;***
>
> - reviewing and approving all related party transactions; and
>
> - ***overseeing compliance with legal and regulatory requirements.***

(Emphasis added).

105.   The 2017 Proxy included the Report of the Audit Committee, signed by defendants T. Knox, Andrews, B. Knox, and Bokhari, and which among other things, stated:

> First, ***the Audit Committee is charged with monitoring the preparation of quarterly and annual financial reports by the Company's management, including discussions with management and the Company's outside auditors about draft annual financial statements and key accounting and reporting matters.***
>
> \*       \*       \*
>
> Third, ***the Audit Committee reviews financial reporting, policies, procedures and internal controls of the Company. The Audit Committee has implemented procedures to ensure that during the course of each fiscal year it devotes the attention that it deems necessary or appropriate to each of the matters assigned to it under the Audit Committee's charter.***   In overseeing the preparation of the Company's financial statements, the Audit Committee met with management and the Company's outside auditors, including meetings with the Company's outside auditors without management present, to review and discuss all financial statements prior to their issuance and to discuss significant accounting issues. Management advised the Audit Committee that all financial statements were prepared in accordance with generally accepted accounting principles, and the Audit Committee discussed the statements with both management and the outside auditors. The Audit Committee's review included discussion with the outside auditors of matters required to be discussed pursuant to Statement on Auditing Standards No. 61 (Communication with Audit Committees).
>
> \*       \*       \*
>
> *Recommendations of the Audit Committee.* In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board that the Board approve the inclusion of the Company's audited financial statements in the Company's Annual Report on Form

47

10-K for the fiscal year ended December 31, 2016, for filing with the SEC.

(Emphasis added).

106.   The 2017 Proxy also made false and misleading statements in support of the shareholder vote to approve the Company's 2017 Equity Incentive Plan, stating that the Plan's compensation awards were subject to certain performance goals and objectives which encouraged and rewarded the Individual Defendants misconduct as described herein.  Specifically, the 2017 Proxy stated, in relevant part:

> The Compensation Committee may grant restricted stock or restricted stock units with vesting conditions based on continuing employment (or other service relationship), achievement of pre-established performance goals and objectives which may be based on targets for revenue, revenue growth, EBITDA, net income, earnings per share and/or other such criteria as the Compensation Committee may determine. The Compensation Committee shall, within the time prescribed by Section 162(m) of the Code, define in an objective fashion the manner of calculating the performance criteria it selects to use for the performance period for a participant.

107.   The 2017 Proxy was false and misleading because it solicited Akers shareholder votes for director re-election and election even though Akers, Jr., Gormally, T. Knox, B. Knox, Andrews, and Bokhari were aware, but had failed to disclose that: (i) Akers improperly recognized revenue for the fiscal year 2017; (ii) Akers had serious weaknesses in its internal controls over financial reporting; and (iii) as a result of the foregoing, the Company's statements about Akers' business,

operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

## EXCESSIVE COMPENSATION

108.   Certain of the Individual Defendants further breached their fiduciary duties in awarding excessive compensation resulting in unjust enrichment and waste of corporate assets.   Defendants T. Knox, Tarbox, B. Knox, Andrews, Bokhari, White, and Schreiber all served on the Compensation Committee.

109.   Specifically, as executives, defendants Gormally, Rauch, and Akers Jr. were awarded salaries and stock-based compensation that were not justified given the state of affairs at the Company.

110.   Defendant Gormally was appointed CEO in 2015 even though he had no prior experience in that role.   In fiscal year 2016, Gormally's compensation totaled $311,025, comprised of $248,500 in salary, $54,725 in stock awards, and $7,800 in other compensation.   In fiscal year 2017, Gormally's compensation increased to $511,915, comprised of $322,115 in salary, $132,000 in stock awards, a $50,000 cash bonus, and $7,800 in all other compensation.   The Company issued defendant Gormally an additional 150,000 restricted stock units on October 17, 2017, which represented an approximate value of $158,400.   Finally, in connection with Gormally's resignation on October 5, 2018, he received a bonus package

consisting of a cash payment of $100,000 and 27,500 shares of restricted stock that were previously issued to him but had not fully vested.

111.   Defendant Rauch, as Vice President of Finance and Treasurer, received a salary of $95,000 for fiscal year 2016.   For fiscal year 2017, Rauch's total compensation was $161,855, comprised of $111,031 in salary, $31,924 in stock awards, and an $18,900 cash bonus.   Rauch received an additional 36,277 restricted shares of Akers common stock on October 17, 2017, which represented an approximate value of $38,308.

112.   Defendant Akers Jr., as Secretary and Chief Scientific Director, was awarded total compensation for the fiscal year 2016 of $277,031, of which $269,231 was salary.   For fiscal year 2017, Akers Jr. received a total of $296,262 in compensation, of which $288,642 was salary.

113.   Portions of the compensation that Gormally, Rauch, and Akers Jr. received were performance-based.   Performance was evaluated using metrics that were artificially inflated as a result of the accounting issues described herein, thus defendants Gormally, Rauch, and Akers Jr. were unjustly enriched.

## DAMAGES TO AKERS

114.   As a result of the Individual Defendants' wrongful conduct alleged herein, Akers lacked adequate internal controls, which led to, among other things, the dissemination of false and misleading statements and omission of material

information that would have rendered certain statements either false or misleading. This course of conduct has devastated the Company's credibility.  Akers has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

115.   The Individual Defendants partially acknowledged these damages in the Company's Form 10-Q for the second quarter of 2018, filed August 14, 2018, as follows:

> As a result of the 2017 restatements and associated non-reliance on previously issued financial information, we have become subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement and the remediation of our ineffective disclosure controls and procedures and material weakness in internal control over financial reporting.  Likewise, the attention of our management team has been diverted by these efforts.  In addition, we could also be subject to additional shareholder, governmental, regulatory or other actions or demands in connection with the restatement or other matters.  Any such proceedings will, regardless of the outcome, consume a significant amount of management's time and attention and may result in additional legal, accounting, insurance and other costs.  If we do not prevail in any such proceedings, we could be required to pay damages or settlement costs.  In addition, the restatement and related matters could impair our reputation or could cause our customers, shareholders, or other counterparties to lose confidence in us.  Any of these occurrences could have a material adverse effect on our business, results of operations, financial condition and stock price.

116.   Indeed, as a result of the Individual Defendants' false and misleading statements as alleged herein the Company has been forced to defend the Securities Class Action.

117.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Akers' market capitalization has been substantially damaged, representing a loss of approximately $350 million, or 96% of its value, as a result of the conduct described herein.

118.   Moreover, these actions have irreparably damaged Akers' corporate image and goodwill.  For at least the foreseeable future, Akers will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Akers' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFFS' DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

119.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

120.   Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, corporate waste, and violations of federal law.

121.   Plaintiffs own Akers common stock and owned Akers common stock at all times relevant hereto.

122.   Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

123.   Plaintiffs each made a demand on the Board pursuant to New Jersey Revised Statutes Title 14A on November 2, 2018.  *See* N.J.S.A. 14A:3-6.3.  The Demands set forth the series of false and misleading statements caused to be made by the Individual Defendants and other evidence of wrongdoing described herein. The Demands requested that the Company's Board, then made up of defendants Schreiber, White, and Silverman, take immediate action to pursue the causes of action described herein.   Copies of the Demands are attached hereto and incorporated herein as Exhibit A.

124.   The Board received the Demands on November 5, 2018 yet failed to respond for over ten weeks.  Copies of the USPS Return Receipts for the Demands are attached hereto and incorporated herein as Exhibit B.

125.   Plaintiffs sent a follow-up letter to the Board on January 16, 2019, including copies of the November 2, 2018 Demands.  A copy of the January 16, 2019 follow-up letter (without enclosures) is attached hereto and incorporated herein as Exhibit C.

126.   Finally, on January 24, 2019, almost three months after receiving the Demands, counsel for Akers sent a letter to Plaintiffs that was unresponsive to Plaintiffs' Demands.  Instead, counsel for Akers stated that the Company had entered into a memorandum of understanding ("MOU") with Watts, another purported Akers shareholder, on January 23, 2019, purportedly settling all of the claims

included in Plaintiffs' Demands.   Watts filed a demand-excused shareholder derivative complaint in the District Court of New Jersey on November 9, 2018.  A copy of the January 24, 2019 letter to Plaintiffs from counsel for Akers is attached hereto and incorporated herein as Exhibit D.

127.   Pursuant to New Jersey law, no shareholder may commence a derivative proceeding without first making a litigation demand.  *See* N.J.S.A. 14A:3-6.3, 6.9.  Watts filed his action without making a litigation demand and instead pleaded demand futility, which is not statutorily permitted with respect to New Jersey corporations.  Accordingly, Watts did not have standing to bring a derivative action.

128.   Rather than take appropriate action to investigate the valid Demands of Plaintiffs, Akers negotiated with a party that did not have standing.  Plaintiffs alerted counsel for Akers of the Board's mistake in a response letter dated January 25, 2019, attaching the USPS Return Receipts for the Demands.  Plaintiffs also requested a copy of the MOU between Akers and Watts to review and determine if it adequately addressed the concerns in the Demands.  A copy of the January 25, 2019 letter from Plaintiffs to counsel for Akers is attached (without enclosures) hereto and incorporated herein as Exhibit E.

129.   Counsel for Akers responded with a letter on January 29, 2019 that informed Plaintiffs that Akers had engaged in a mediation on "January 10, 2018

[sic]" with demand-excused plaintiff Watts and had settled that case.  Counsel for Akers stated in the letter that the parties agreed to corporate governance reforms that included "the implementation of a policy regarding whistleblowers, the creation of a risk and disclosure committee, modifications to the audit committee charter, the nominating and corporate governance committee charter, and the compensation committee charter, adoption of policies regarding executive reports, and mandatory attendance of directors at annual shareholder meetings."  The letter failed to provide details of any of these purported reforms and counsel for Akers did not provide a copy of the MOU as requested by Plaintiffs.  A copy of the January 29, 2019 letter from counsel for Akers is attached hereto and incorporated herein as Exhibit F.

130.   Finally, on February 1, 2019, Plaintiffs sent a letter to counsel for Akers renewing their request to review the MOU and asking for specific details as to what actions, if any, the Board took in response to the Demands.  A copy of the February 1, 2019 letter from Plaintiffs to counsel for Akers is attached hereto and incorporated herein as Exhibit G.

131.   As of this filing, counsel for Akers has not responded to the February 1, 2019 letter.

## COUNT I

**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
(Against Gormally, Akers, Jr., T. Knox, B. Knox, Andrews, and Bokhari)**

132.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

133.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants named on this Count.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

134.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

135.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. § 240.14a-9.

136.   The 2017 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Akers shareholders' votes for director re-election and election while simultaneously misrepresenting and/or failing to disclose the that:   (i) Akers improperly recognized revenue for fiscal year 2017; (ii) Akers had serious weaknesses in its internal controls over financial reporting; and (iii) as a result of the foregoing, the Company's statements about Akers' business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

137.   As alleged herein, in the 2017 Proxy, the Individual Defendants named in this Count negligently issued, caused the Company to issue, and participated in the issuance of untrue statements of material facts and omitted material facts necessary to make the issued statements not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

138.   In the exercise of reasonable care, the Individual Defendants named in this Count should have known that the statements contained in the 2017 Proxy were materially false and misleading.

139.   The false and misleading statements and omissions in the 2017 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election and election of directors.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to shareholders.

140.   As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy the Individual Defendants named in this Count used to obtain shareholder approval of and thereby re-elect and elect directors, nominal defendant Akers suffered damage and actual economic losses (*i.e.*, wrongful re-election and election of directors) in an amount to be determined at trial.

## COUNT II

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

141.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

142.   The Individual Defendants owed and owe Akers fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Akers the highest obligation of loyalty, good faith, due care, oversight, and candor.

143.   All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

144.   Each of the Individual Defendants intentionally or recklessly caused the Company to fail to maintain proper internal controls and to fail to disclose that: (i) Akers improperly recognized revenue for fiscal year 2017; (ii) Akers had serious weaknesses in its internal controls over financial reporting; and (iii) as a result, the Individual Defendants' statements about the business, operations, and prospects of the Company were materially false and misleading at all relevant times.  These actions caused severe risks to the Company's financial viability and are actually causing harm to the Company by subjecting the Company to the Securities Class Action.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.   As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Akers has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their

fiduciary duties owed to Akers and its shareholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee Akers' business, rendering them personally liable to the Company.

146. Plaintiffs, on behalf of Akers, have no adequate remedy at law.

## COUNT III

**Unjust Enrichment**
**(Against Gormally, Rauch, and Akers Jr.)**

147. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

148. Defendants Gormally, Rauch, and Akers Jr. were unjustly enriched by their receipt of excessive compensation.

149. To remedy defendants Gormally, Rauch, and Akers Jr.'s unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their excessive compensation.

## COUNT IV

**Waste of Corporate Assets**
**(Against the Individual Defendants)**

150. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

151.   The Individual Defendants owed Akers the obligation to avoid wasting Akers' assets.

152.   The Individual Defendants breached their obligations to Akers and wasted corporate assets by subjecting the Company to multiple federal securities class action lawsuits, causing the Company to incur substantial costs.

153.   As a direct and proximate result of the waste of corporate assets by the Individual Defendants, Akers has been and continues to be damaged.

154.   Plaintiffs, on behalf of Akers, have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of Akers, demand judgment, as follows:

A.   Declaring that Plaintiffs may maintain this derivative action on behalf of Akers and that Plaintiffs are a proper and adequate representative of the Company;

B.   Finding that each of the Individual Defendants breached their fiduciary duties to Akers;

C.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, unjust enrichment, and waste of corporate assets;

D.   Imposing a constructive trust and awarding the Company the disgorgement of all excessive compensation received by defendants Gormally,

Rauch, and Akers Jr. due to their wrongful conduct and breach of their fiduciary duties;

E.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

<u>**JURY TRIAL DEMAND**</u>

Plaintiffs demand a trial by jury.

Dated:  February 7, 2019                    **GARDY & NOTIS, LLP**

                                            /s/ *Jennifer Sarnelli*
                                            Jennifer Sarnelli
                                            James S. Notis
                                            560 Sylvan Avenue, Suite 3085
                                            Englewood Cliffs, New Jersey 07632
                                            Telephone: 201-567-7377
                                            Facsimile: 201-567-7337
                                            Email:  jsarnelli@gardylaw.com
                                                    jnotis@gardylaw.com

                                            *Liaison Counsel for Plaintiffs*

Lawrence P. Eagel
Marion C. Passmore
Melissa A. Fortunato
**BRAGAR EAGEL & SQUIRE, P.C.**
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:  (212) 308-5858
Facsimile:  (212) 486-0462
Email:  eagel@bespc.com
passmore@bespc.com
fortunato@bespc.com

*Counsel for Plaintiffs*

# EXHIBIT A

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

J. Brandon Walker
885 Third Avenue
Suite 3040
New York. NY 10022
Tel: (212) 355-4648
Fax: (212) 214-0506
walker@bespc.com

November 2, 2018

**BY CERTIFIED MAIL**

Joshua Silverman
Director
Akers Biosciences, Inc.
201 Grove Road
West Deptford, New Jersey 08086

   Re: *Akers Biosciences, Inc. Stockholder Litigation Demand*

Dear Mr. Silverman:

  We represent Tiffany Chan (the "Stockholder"), a holder of Akers Biosciences, Inc. ("Akers" or the "Company") common stock since March 9, 2018. I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take immediate action to pursue certain causes of action on behalf of the Company against the following former and current directors and officers: former Chief Executive Officer and Director ("CEO"), John J. Gormally ("Gormally"); Vice President, Finance, Principal Accounting Officer and Treasurer, Gary M. Rauch ("Rauch"); Former Executive Chairman of the Board, Chief Scientific Director, Secretary, and founder of the Company, Dr. Raymond F. Akers, Jr., Ph.D. ("Akers Jr."); former Non-Executive Chairman of the Board Thomas Knox; former Non-Executive Chairman of the Board, Secretary, and director, Richard C. Tarbox, III ("Tarbox"); former directors Brandon Knox, Robert E. Andrews, and Dr. Raza Bokhari; and current directors Bill J. White and Christopher C. Schreiber (collectively, the "Directors and Officers").

  From at least April 11, 2017 through July 13, 2018, the Directors and Officers of the Company made a series of misleading statements and omissions regarding the Company's financial reporting relating to both its internal controls and revenue reporting. On April 11, 2017, the Directors and Officers caused the Company to file a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the Securities and Exchange Commission ("SEC"). The 2016 10-K reported "a material weakness in [the Company's] controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation." To explain these weaknesses, the Company stated that its "management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists." Therefore, the Company committed to hiring a Financial Controller in 2017 to improve its "overall compliance with COSO[,]" while noting that "the control deficiencies result in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls." Yet, the Company also stated that it believed risk of material misstatements in its financial reporting were "minimal," and on

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 2

April 18, 2017, filed an amended 2016 10-K attaching an accountant's attestation to the financial statement.

On an April 11, 2017 earnings call (the "Q4 2016 Earnings Call"), Rauch reported a 40% increase in revenue in 2016 and Akers Jr. noted some details about the results of product tests and data analysis, but neither mentioned the "material weaknesses" or the "other immaterial weaknesses in several areas of data management and documentation."

In the Company's Form 10-Q for the first quarter of 2017 (the "Q1 2017 10-Q"), the Directors and Officers caused the Company to falsely report that "[t]here were no changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The Forms 10-Q for the second and third quarters of 2017 repeated this statement. All three quarterly reports were materially misleading because they withheld the truth about the Company's internal control weaknesses.

On April 3, 2018, the Directors and Offices caused the Company to file a Form NT 10-K, disclosing that the Company needed "additional time to gather information and finalize its financial statements." The Directors and Officers still proceeded to cause the Company to file its Form 10-K that same day (the "2017 10-K"), which revealed that they had "identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation." The 2017 10-K also lacked an attestation report of the Company's registered accounting firm regarding its financial statement and financial reporting controls. The 2017 10-K continued to report robust revenue figures for the fourth quarter and fiscal year 2017 without qualifying the figures.

Also, on April 3, 2018, during the Company's earnings call (the "Q4 2017 Earnings Call"), the Directors and Officers continued to materially misrepresent the Company's balance sheet and revenue statements. On the Q4 2017 Earnings Call, Gormally misrepresented that: (a) in 2017 the Company had "strengthened [its] balance sheet with net proceeds from Public Offerings, [its] Private Placement and the conversion of warrants" which would "accelerate revenue growth in the months and years ahead;" and (b) the Company had "taken the necessary steps to strengthen [its] business across key areas" with the ultimate goal to "materially accelerate the rate of revenue growth." On the same call, Rauch misled investors by stating that revenue figures were "up by a third" without qualification.

On April 26, 2018, the Company announced that it had terminated Akers, Jr. from his positions as Executive Chairman of the Board, Chief Scientific Director, and Secretary. Akers Jr. retained his seat on the Board.

On May 16, 2018, the Directors and Officers caused the Company to disclose in a Form 12b-25 that it again needed additional time to review its finances, specifically needing to examine "certain revenue recognition items for this quarter." As a result, on May 25, 2018, NASDAQ sent the Company a notice of delinquency regarding its first quarter 2018 Form 10-Q.

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 3

On May 27, 2018, Akers Jr. resigned from the Board, and on May 30, 2018, sent a letter of disagreement to the Board, citing "significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel."

On June 1, 2018, the Directors and Officers caused the Company to file a Form 8-K (the "June 1, 2018 8-K"), which stated that: (a) Akers Jr. disagreed with the Board as to the Audit Committee's review of "certain revenue recognition items with respect to the first quarter of 2018 as well as previous quarters"; (b) Akers Jr. had resigned his directorship on May 27, 2018; (c) the delay in producing financial reports was due to a review of the revenue recognition items; and (d) Akers Jr. had "not been fully cooperative in connection with such review."

Later on June 1, 2018, Akers Jr.'s attorney responded to the Company in a letter, which the Company disclosed in a June 5, 2018 amendment to the June 1, 2018 8-K. The letter stated that: (a) the June 1, 2018 8-K contained "false, totally misleading" language; (b) Akers Jr. was actually a "whistleblower" at the Company; (c) Akers Jr.'s refusal to approve the 2017 10-K and his demand for an investigation were the sole reasons that the Company began to investigate revenue recognition issues; and (d) the Company was being "utterly disingenuous [sic]" by claiming Akers Jr. had been uncooperative.

On June 19, 2018, the Directors and Officers caused the Company to file another Form 8-K, which disclosed that the Company's independent registered public accounting firm had advised the Board not to rely on previously filed financial statements contained in the 2017 10-K, as well as those contained in the Forms 10-Q for the second and third quarters of 2017.

On July 13, 2018, the Directors and Officers caused the Company to file an amendment to the 2017 10-K (the "Amended 2017 10-K") informing investors that the Board had formed a special committee after the filing of the 2017 10-K and engaged outside counsel and forensic accountants to investigate the Company's financial statements. The Amended 2017 10-K disclosed that the investigation identified "misstatements relevant to the Company's historical revenue recognition, expense accrual and inventory valuation policies and procedures" and that "[t]hese misstatements resulted in a material misstatement of the financial statements and required restatement of the financial statements included in the Company's Form 10-K for the fiscal year ended December 31, 2017 and in the Company's Forms 10-Q for the quarterly periods ended June 30, 2017 and September 30, 2017." Further, the Amended 2017 10-K admitted that the misstatements "were not detected timely by management, were the result of inadequate design of controls pertaining to the Company's review and ongoing monitoring of its revenue recognition, expense accrual and inventory valuation policies" and that the "deficiency represents a material weakness in Company's internal control over financial reporting."

On October 5, 2018, Gormally resigned from his positions as CEO and director and on October 18, 2018, Tarbox resigned from his positions as interim Non-Executive Chairman of the Board, Secretary, and director. The Board is currently without a Chairman.

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 4

As a result of the foregoing breaches of fiduciary duty, the Company has sustained significant damages. The Company's stock has dropped by over 80% due to the false statements made from April 11, 2017 through July 13, 2018. The Company has also seen the departure of several key figures – each of whom was paid significant severance – and has been forced to face the costs of finding replacements. In addition, the Company now faces two federal securities fraud class actions, *Faulkner v. Akers Biosciences, Inc. et al.*, Case No. 2:18-cv-10521 and *Gleason v. Akers Biosciences, Inc. et al.*, Case No. 2:18-cv-10805, both pending in the United States District Court for the District of New Jersey. The Company has also suffered damage to its reputation and goodwill as a result of the Directors' and Officers' breaches of their fiduciary duties. The Directors and Officers acknowledged these damages in the Company's Form 10-Q for the second quarter of 2018, filed August 14, 2018, as follows:

> As a result of the 2017 restatements and associated non-reliance on previously issued financial information, we have become subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement and the remediation of our ineffective disclosure controls and procedures and material weakness in internal control over financial reporting. Likewise, the attention of our management team has been diverted by these efforts. In addition, we could also be subject to additional shareholder, governmental, regulatory or other actions or demands in connection with the restatement or other matters. Any such proceedings will, regardless of the outcome, consume a significant amount of management's time and attention and may result in additional legal, accounting, insurance and other costs. If we do not prevail in any such proceedings, we could be required to pay damages or settlement costs. In addition, the restatement and related matters could impair our reputation or could cause our customers, shareholders, or other counterparties to lose confidence in us. Any of these occurrences could have a material adverse effect on our business, results of operations, financial condition and stock price.

On behalf of the Stockholder, I hereby demand that the Board take action against the Directors and Officers to recover the damages described herein for the benefit of the Company and to correct the deficiencies in the Company's controls that allowed the misconduct to occur.

If the Company does not take appropriate action within a reasonable period of time, the Stockholder will commence a derivative action on behalf of the Company to obtain appropriate relief. This stockholder demand also serves to put all affected entities and individuals identified herein on notice of their document preservation and collection responsibilities.

Sincerely yours,

J. Brandon Walker

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

J. Brandon Walker
885 Third Avenue
Suite 3040
New York, NY 10022
Tel: (212) 355-4648
Fax: (212) 214-0506
walker@bespc.com

November 2, 2018

**BY CERTIFIED MAIL**

Joshua Silverman
Director
Akers Biosciences, Inc.
201 Grove Road
West Deptford, New Jersey 08086

        Re:    *Akers Biosciences, Inc. Stockholder Litigation Demand*

Dear Mr. Silverman:

We represent Jasmine Henderson (the "Stockholder"), a holder of Akers Biosciences, Inc. ("Akers" or the "Company") common stock since March 19, 2018.  I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take immediate action to pursue certain causes of action on behalf of the Company against the following former and current directors and officers:  former Chief Executive Officer and Director ("CEO"), John J. Gormally ("Gormally"); Vice President, Finance, Principal Accounting Officer and Treasurer, Gary M. Rauch ("Rauch"); Former Executive Chairman of the Board, Chief Scientific Director, Secretary, and founder of the Company, Dr. Raymond F. Akers, Jr., Ph.D. ("Akers Jr."); former Non-Executive Chairman of the Board Thomas Knox; former Non-Executive Chairman of the Board, Secretary, and director, Richard C. Tarbox, III ("Tarbox"); former directors Brandon Knox, Robert E. Andrews, and Dr. Raza Bokhari; and current directors Bill J. White and Christopher C. Schreiber (collectively, the "Directors and Officers").

From at least April 11, 2017 through July 13, 2018, the Directors and Officers of the Company made a series of misleading statements and omissions regarding the Company's financial reporting relating to both its internal controls and revenue reporting.  On April 11, 2017, the Directors and Officers caused the Company to file a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the Securities and Exchange Commission ("SEC").  The 2016 10-K reported "a material weakness in [the Company's] controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation."  To explain these weaknesses, the Company stated that its "management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists."  Therefore, the Company committed to hiring a Financial Controller in 2017 to improve its "overall compliance with COSO[,]" while noting that "the control deficiencies result in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls."  Yet, the Company also stated that it believed risk of material misstatements in its financial reporting were "minimal," and on

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 2

April 18, 2017, filed an amended 2016 10-K attaching an accountant's attestation to the financial statement.

On an April 11, 2017 earnings call (the "Q4 2016 Earnings Call"), Rauch reported a 40% increase in revenue in 2016 and Akers Jr. noted some details about the results of product tests and data analysis, but neither mentioned the "material weaknesses" or the "other immaterial weaknesses in several areas of data management and documentation."

In the Company's Form 10-Q for the first quarter of 2017 (the "Q1 2017 10-Q"), the Directors and Officers caused the Company to falsely report that "[t]here were no changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The Forms 10-Q for the second and third quarters of 2017 repeated this statement. All three quarterly reports were materially misleading because they withheld the truth about the Company's internal control weaknesses.

On April 3, 2018, the Directors and Offices caused the Company to file a Form NT 10-K, disclosing that the Company needed "additional time to gather information and finalize its financial statements." The Directors and Officers still proceeded to cause the Company to file its Form 10-K that same day (the "2017 10-K"), which revealed that they had "identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation." The 2017 10-K also lacked an attestation report of the Company's registered accounting firm regarding its financial statement and financial reporting controls. The 2017 10-K continued to report robust revenue figures for the fourth quarter and fiscal year 2017 without qualifying the figures.

Also, on April 3, 2018, during the Company's earnings call (the "Q4 2017 Earnings Call"), the Directors and Officers continued to materially misrepresent the Company's balance sheet and revenue statements. On the Q4 2017 Earnings Call, Gormally misrepresented that: (a) in 2017 the Company had "strengthened [its] balance sheet with net proceeds from Public Offerings, [its] Private Placement and the conversion of warrants" which would "accelerate revenue growth in the months and years ahead;" and (b) the Company had "taken the necessary steps to strengthen [its] business across key areas" with the ultimate goal to "materially accelerate the rate of revenue growth." On the same call, Rauch misled investors by stating that revenue figures were "up by a third" without qualification.

On April 26, 2018, the Company announced that it had terminated Akers, Jr. from his positions as Executive Chairman of the Board, Chief Scientific Director, and Secretary. Akers Jr. retained his seat on the Board.

On May 16, 2018, the Directors and Officers caused the Company to disclose in a Form 12b-25 that it again needed additional time to review its finances, specifically needing to examine "certain revenue recognition items for this quarter." As a result, on May 25, 2018, NASDAQ sent the Company a notice of delinquency regarding its first quarter 2018 Form 10-Q.

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 3

On May 27, 2018, Akers Jr. resigned from the Board, and on May 30, 2018, sent a letter of disagreement to the Board, citing "significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel."

On June 1, 2018, the Directors and Officers caused the Company to file a Form 8-K (the "June 1, 2018 8-K"), which stated that: (a) Akers Jr. disagreed with the Board as to the Audit Committee's review of "certain revenue recognition items with respect to the first quarter of 2018 as well as previous quarters"; (b) Akers Jr. had resigned his directorship on May 27, 2018; (c) the delay in producing financial reports was due to a review of the revenue recognition items; and (d) Akers Jr. had "not been fully cooperative in connection with such review."

Later on June 1, 2018, Akers Jr.'s attorney responded to the Company in a letter, which the Company disclosed in a June 5, 2018 amendment to the June 1, 2018 8-K. The letter stated that: (a) the June 1, 2018 8-K contained "false, totally misleading" language; (b) Akers Jr. was actually a "whistleblower" at the Company; (c) Akers Jr.'s refusal to approve the 2017 10-K and his demand for an investigation were the sole reasons that the Company began to investigate revenue recognition issues; and (d) the Company was being "utterly disingenuious [sic]" by claiming Akers Jr. had been uncooperative.

On June 19, 2018, the Directors and Officers caused the Company to file another Form 8-K, which disclosed that the Company's independent registered public accounting firm had advised the Board not to rely on previously filed financial statements contained in the 2017 10-K, as well as those contained in the Forms 10-Q for the second and third quarters of 2017.

On July 13, 2018, the Directors and Officers caused the Company to file an amendment to the 2017 10-K (the "Amended 2017 10-K") informing investors that the Board had formed a special committee after the filing of the 2017 10-K and engaged outside counsel and forensic accountants to investigate the Company's financial statements. The Amended 2017 10-K disclosed that the investigation identified "misstatements relevant to the Company's historical revenue recognition, expense accrual and inventory valuation policies and procedures" and that "[t]hese misstatements resulted in a material misstatement of the financial statements and required restatement of the financial statements included in the Company's Form 10-K for the fiscal year ended December 31, 2017 and in the Company's Forms 10-Q for the quarterly periods ended June 30, 2017 and September 30, 2017." Further, the Amended 2017 10-K admitted that the misstatements "were not detected timely by management, were the result of inadequate design of controls pertaining to the Company's review and ongoing monitoring of its revenue recognition, expense accrual and inventory valuation policies" and that the "deficiency represents a material weakness in Company's internal control over financial reporting."

On October 5, 2018, Gormally resigned from his positions as CEO and director and on October 18, 2018, Tarbox resigned from his positions as interim Non-Executive Chairman of the Board, Secretary, and director. The Board is currently without a Chairman.

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 4

As a result of the foregoing breaches of fiduciary duty, the Company has sustained significant damages. The Company's stock has dropped by over 80% due to the false statements made from April 11, 2017 through July 13, 2018. The Company has also seen the departure of several key figures – each of whom was paid significant severance – and has been forced to face the costs of finding replacements. In addition, the Company now faces two federal securities fraud class actions, *Faulkner v. Akers Biosciences, Inc. et al.*, Case No. 2:18-cv-10521 and *Gleason v. Akers Biosciences, Inc. et al.*, Case No. 2:18-cv-10805, both pending in the United States District Court for the District of New Jersey. The Company has also suffered damage to its reputation and goodwill as a result of the Directors' and Officers' breaches of their fiduciary duties. The Directors and Officers acknowledged these damages in the Company's Form 10-Q for the second quarter of 2018, filed August 14, 2018, as follows:

> As a result of the 2017 restatements and associated non-reliance on previously issued financial information, we have become subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement and the remediation of our ineffective disclosure controls and procedures and material weakness in internal control over financial reporting. Likewise, the attention of our management team has been diverted by these efforts. In addition, we could also be subject to additional shareholder, governmental, regulatory or other actions or demands in connection with the restatement or other matters. Any such proceedings will, regardless of the outcome, consume a significant amount of management's time and attention and may result in additional legal, accounting, insurance and other costs. If we do not prevail in any such proceedings, we could be required to pay damages or settlement costs. In addition, the restatement and related matters could impair our reputation or could cause our customers, shareholders, or other counterparties to lose confidence in us. Any of these occurrences could have a material adverse effect on our business, results of operations, financial condition and stock price.

On behalf of the Stockholder, I hereby demand that the Board take action against the Directors and Officers to recover the damages described herein for the benefit of the Company and to correct the deficiencies in the Company's controls that allowed the misconduct to occur.

If the Company does not take appropriate action within a reasonable period of time, the Stockholder will commence a derivative action on behalf of the Company to obtain appropriate relief. This stockholder demand also serves to put all affected entities and individuals identified herein on notice of their document preservation and collection responsibilities.

Sincerely yours,

J. Brandon Walker

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

J. Brandon Walker
885 Third Avenue
Suite 3040
New York, NY 10022
Tel: (212) 355-4648
Fax: (212) 214-0506
walker@bespc.com

November 2, 2018

**BY CERTIFIED MAIL**

Joshua Silverman
Director
Akers Biosciences, Inc.
201 Grove Road
West Deptford, New Jersey 08086

Re:    *Akers Biosciences, Inc. Stockholder Litigation Demand*

Dear Mr. Silverman:

We represent Don Danesh Wijesekera (the "Stockholder"), a holder of Akers Biosciences, Inc. ("Akers" or the "Company") common stock since March 29, 2018.  I write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take immediate action to pursue certain causes of action on behalf of the Company against the following former and current directors and officers:  former Chief Executive Officer and Director ("CEO"), John J. Gormally ("Gormally"); Vice President, Finance, Principal Accounting Officer and Treasurer, Gary M. Rauch ("Rauch"); Former Executive Chairman of the Board, Chief Scientific Director, Secretary, and founder of the Company, Dr. Raymond F. Akers, Jr., Ph.D. ("Akers Jr."); former Non-Executive Chairman of the Board Thomas Knox; former Non-Executive Chairman of the Board, Secretary, and director, Richard C. Tarbox, III ("Tarbox"); former directors Brandon Knox, Robert E. Andrews, and Dr. Raza Bokhari; and current directors Bill J. White and Christopher C. Schreiber (collectively, the "Directors and Officers").

From at least April 11, 2017 through July 13, 2018, the Directors and Officers of the Company made a series of misleading statements and omissions regarding the Company's financial reporting relating to both its internal controls and revenue reporting. On April 11, 2017, the Directors and Officers caused the Company to file a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the Securities and Exchange Commission ("SEC"). The 2016 10-K reported "a material weakness in [the Company's] controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation." To explain these weaknesses, the Company stated that its "management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists." Therefore, the Company committed to hiring a Financial Controller in 2017 to improve its "overall compliance with COSO[,]" while noting that "the control deficiencies result in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls." Yet, the Company also stated that it believed risk of material misstatements in its financial reporting were "minimal," and on

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 2

April 18, 2017, filed an amended 2016 10-K attaching an accountant's attestation to the financial statement.

On an April 11, 2017 earnings call (the "Q4 2016 Earnings Call"), Rauch reported a 40% increase in revenue in 2016 and Akers Jr. noted some details about the results of product tests and data analysis, but neither mentioned the "material weaknesses" or the "other immaterial weaknesses in several areas of data management and documentation."

In the Company's Form 10-Q for the first quarter of 2017 (the "Q1 2017 10-Q"), the Directors and Officers caused the Company to falsely report that "[t]here were no changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The Forms 10-Q for the second and third quarters of 2017 repeated this statement. All three quarterly reports were materially misleading because they withheld the truth about the Company's internal control weaknesses.

On April 3, 2018, the Directors and Offices caused the Company to file a Form NT 10-K, disclosing that the Company needed "additional time to gather information and finalize its financial statements." The Directors and Officers still proceeded to cause the Company to file its Form 10-K that same day (the "2017 10-K"), which revealed that they had "identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation." The 2017 10-K also lacked an attestation report of the Company's registered accounting firm regarding its financial statement and financial reporting controls. The 2017 10-K continued to report robust revenue figures for the fourth quarter and fiscal year 2017 without qualifying the figures.

Also, on April 3, 2018, during the Company's earnings call (the "Q4 2017 Earnings Call"), the Directors and Officers continued to materially misrepresent the Company's balance sheet and revenue statements. On the Q4 2017 Earnings Call, Gormally misrepresented that: (a) in 2017 the Company had "strengthened [its] balance sheet with net proceeds from Public Offerings, [its] Private Placement and the conversion of warrants" which would "accelerate revenue growth in the months and years ahead;" and (b) the Company had "taken the necessary steps to strengthen [its] business across key areas" with the ultimate goal to "materially accelerate the rate of revenue growth." On the same call, Rauch misled investors by stating that revenue figures were "up by a third" without qualification.

On April 26, 2018, the Company announced that it had terminated Akers, Jr. from his positions as Executive Chairman of the Board, Chief Scientific Director, and Secretary. Akers Jr. retained his seat on the Board.

On May 16, 2018, the Directors and Officers caused the Company to disclose in a Form 12b-25 that it again needed additional time to review its finances, specifically needing to examine "certain revenue recognition items for this quarter." As a result, on May 25, 2018, NASDAQ sent the Company a notice of delinquency regarding its first quarter 2018 Form 10-Q.

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 3

On May 27, 2018, Akers Jr. resigned from the Board, and on May 30, 2018, sent a letter of disagreement to the Board, citing "significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel."

On June 1, 2018, the Directors and Officers caused the Company to file a Form 8-K (the "June 1, 2018 8-K"), which stated that: (a) Akers Jr. disagreed with the Board as to the Audit Committee's review of "certain revenue recognition items with respect to the first quarter of 2018 as well as previous quarters"; (b) Akers Jr. had resigned his directorship on May 27, 2018; (c) the delay in producing financial reports was due to a review of the revenue recognition items; and (d) Akers Jr. had "not been fully cooperative in connection with such review."

Later on June 1, 2018, Akers Jr.'s attorney responded to the Company in a letter, which the Company disclosed in a June 5, 2018 amendment to the June 1, 2018 8-K. The letter stated that: (a) the June 1, 2018 8-K contained "false, totally misleading" language; (b) Akers Jr. was actually a "whistleblower" at the Company; (c) Akers Jr.'s refusal to approve the 2017 10-K and his demand for an investigation were the sole reasons that the Company began to investigate revenue recognition issues; and (d) the Company was being "utterly disingenuious [sic]" by claiming Akers Jr. had been uncooperative.

On June 19, 2018, the Directors and Officers caused the Company to file another Form 8-K, which disclosed that the Company's independent registered public accounting firm had advised the Board not to rely on previously filed financial statements contained in the 2017 10-K, as well as those contained in the Forms 10-Q for the second and third quarters of 2017.

On July 13, 2018, the Directors and Officers caused the Company to file an amendment to the 2017 10-K (the "Amended 2017 10-K") informing investors that the Board had formed a special committee after the filing of the 2017 10-K and engaged outside counsel and forensic accountants to investigate the Company's financial statements. The Amended 2017 10-K disclosed that the investigation identified "misstatements relevant to the Company's historical revenue recognition, expense accrual and inventory valuation policies and procedures" and that "[t]hese misstatements resulted in a material misstatement of the financial statements and required restatement of the financial statements included in the Company's Form 10-K for the fiscal year ended December 31, 2017 and in the Company's Forms 10-Q for the quarterly periods ended June 30, 2017 and September 30, 2017." Further, the Amended 2017 10-K admitted that the misstatements "were not detected timely by management, were the result of inadequate design of controls pertaining to the Company's review and ongoing monitoring of its revenue recognition, expense accrual and inventory valuation policies" and that the "deficiency represents a material weakness in Company's internal control over financial reporting."

On October 5, 2018, Gormally resigned from his positions as CEO and director and on October 18, 2018, Tarbox resigned from his positions as interim Non-Executive Chairman of the Board, Secretary, and director. The Board is currently without a Chairman.

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

Mr. Silverman
November 2, 2018
Page 4

As a result of the foregoing breaches of fiduciary duty, the Company has sustained significant damages. The Company's stock has dropped by over 80% due to the false statements made from April 11, 2017 through July 13, 2018. The Company has also seen the departure of several key figures – each of whom was paid significant severance – and has been forced to face the costs of finding replacements. In addition, the Company now faces two federal securities fraud class actions, *Faulkner v. Akers Biosciences, Inc. et al.*, Case No. 2:18-cv-10521 and *Gleason v. Akers Biosciences, Inc. et al.*, Case No. 2:18-cv-10805, both pending in the United States District Court for the District of New Jersey. The Company has also suffered damage to its reputation and goodwill as a result of the Directors' and Officers' breaches of their fiduciary duties. The Directors and Officers acknowledged these damages in the Company's Form 10-Q for the second quarter of 2018, filed August 14, 2018, as follows:

> As a result of the 2017 restatements and associated non-reliance on previously issued financial information, we have become subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement and the remediation of our ineffective disclosure controls and procedures and material weakness in internal control over financial reporting. Likewise, the attention of our management team has been diverted by these efforts. In addition, we could also be subject to additional shareholder, governmental, regulatory or other actions or demands in connection with the restatement or other matters. Any such proceedings will, regardless of the outcome, consume a significant amount of management's time and attention and may result in additional legal, accounting, insurance and other costs. If we do not prevail in any such proceedings, we could be required to pay damages or settlement costs. In addition, the restatement and related matters could impair our reputation or could cause our customers, shareholders, or other counterparties to lose confidence in us. Any of these occurrences could have a material adverse effect on our business, results of operations, financial condition and stock price.

On behalf of the Stockholder, I hereby demand that the Board take action against the Directors and Officers to recover the damages described herein for the benefit of the Company and to correct the deficiencies in the Company's controls that allowed the misconduct to occur.

If the Company does not take appropriate action within a reasonable period of time, the Stockholder will commence a derivative action on behalf of the Company to obtain appropriate relief. This stockholder demand also serves to put all affected entities and individuals identified herein on notice of their document preservation and collection responsibilities.

Sincerely yours,

J. Brandon Walker

# EXHIBIT B

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Joshua Silverman, Director
Aesus Biosciences, Inc.
201 Grove Road
West Deptford, New Jersey 08086

9590 9402 3877 8060 1877 02

2. Article Number *(Transfer from service label)*

7016 0910 0000 1358 8814

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☐ Agent   ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery
D. DiCresce   11-5

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Joshua Silverman, Director
Akers Biosciences, Inc.
201 Grove Road
West Deptford, New Jersey 0808

9590 9402 3877 8060 1876 96

2. Article Number (Transfer from service label)

7016 0340 0000 3251 3283

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____

☐ Agent
☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery 500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Joshua Silverman, Director
Ahen Biosciences, Inc.
201 Grove Rd.
West Deptford, New Jersey 08086

9590 9402 3877 8060 1876 89

2. Article Number (Transfer from service label)

7016 0910 0000 1358 8821

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X D. DiCae

☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. DiCae          11-5

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Mail
☐ Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

# EXHIBIT C

B|E|S **BRAGAR EAGEL & SQUIRE, P.C.**

J. Brandon Walker
885 Third Avenue
Suite 3040
New York, NY 10022
Tel: (212) 355-4648
Fax: (212) 214-0506
walker@bespc.com

January 16, 2019

**VIA CERTIFIED MAIL**

Board of Directors
c/o Joshua Silverman, Bill J. White, or Christopher C. Schreiber
Akers Biosciences, Inc.
201 Grove Road
Thorofare, New Jersey 08086

      Re:    *Akers Biosciences, Inc. Stockholder Litigation Demand*

Dear Messrs. Silverman, White, and Schreiber:

      We represent Tiffany Chan, Jasmine Henderson, and Don Danesh Wijesekera (the "Stockholders"), who each made litigation demands (the "Demands") on Akers Biosciences, Inc. (the "Company") on November 2, 2018. To date, the Stockholders have received no response to their Demands. Should no response be forthcoming, the Stockholders will have no choice but to bring a derivative action on behalf of the Company seeking the relief requested in the Demands.

      Sincerely yours,

      J. Brandon Walker

Enclosures:
      November 2, 2018 Litigation Demands

# EXHIBIT D



**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
www.dlapiper.com

Caryn G. Schechtman
caryn.schechtman@dlapiper.com
T   212.335.4593
F   212.884.8593

January 24, 2019
*Via Email Only*

J. Brandon Walker
Bragar Eagel & Squire, P.C.
885 Third Avenue, Suite 3040
New York, NY 10022
walker@bespc.com

Re: *Akers Biosciences, Inc. Stockholder Litigation Demand*

Mr. Walker:

Please be advised that we represent Akers Biosciences, Inc. ("Akers Bio") in connection with Tiffany Chan, Jasmine Henderson, and Don Danesh Wijesekera's litigation demands on Akers Bio, dated November 2, 2018, and January 16, 2019 (the "Stockholders Demands").  We write to inform you that another stockholder, Cale Watts, has already filed a Verified Shareholder Derivative Complaint in the District Court of New Jersey, Docket No. 2:18-cv-15992 ("Watts Action"), against Akers Bio based on the same conduct alleged in the Stockholders' Demands, and the Company has entered into a Memorandum of Understanding with Watts to resolve the dispute.  We attach the Notice of Settlement filed yesterday in the Watts Action for your reference.

Respectfully,

*s/ Caryn G. Schechtman*

Caryn G. Schechtman

**PAWAR LAW GROUP P.C.**
Vik Pawar
20 Vesey Street, Suite 1210
New York, New York 10007
Tel: (212) 571-0805
Fax: (212) 571-0938
Email: vik@pawarlaw.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CALE WATTS, derivatively on behalf of AKERS BIOSCIENCES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN J. GORMALLY, GARY M. RAUCH, RAYMOND F. AKERS, JR., BILL J. WHITE, RICHARD C. TARBOX III, and CHRISTOPHER C. SHREIBER, <br><br> Defendants, <br><br> and <br><br> AKERS BIOSCIENCES, INC., <br><br> Nominal Defendant. | Case No.: 2:18-cv-15992 <br><br> **NOTICE OF SETTLEMENT** |

**PLEASE TAKE NOTICE** that the Parties in the above-referenced action (the "Action") entered into and executed a Memorandum of Understanding on or about January 14, 2019, setting forth terms and conditions to be incorporated into a formal stipulation of settlement pursuant to which the Parties have voluntarily agreed to the settle the Action in principal.

Dated: January 23, 2019

                                    **PAWAR LAW GROUP P.C.**


                    By:             */s/ Vik Pawar*
                                    Vik Pawar
                                    20 Vesey Street, Suite 1210
                                    New York, New York 10007
                                    Tel: (212) 571-0805
                                    Fax: (212) 571-0938
                                    Email: vik@pawarlaw.com

                                    **THE BROWN LAW FIRM, P.C.**
                                    Timothy Brown
                                    240 Townsend Square
                                    Oyster Bay, New York 11771
                                    Tel: (516)-922-5427
                                    Fax: (516) 344-6204
                                    Email: tbrown@thebrownlawfirm.net

                                    *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was filed via the District CM/ECF system on January 23, 2019, which caused an electronic copy of same to be served automatically upon all counsel of record.

Dated: January 23, 2019

*/s/ Vik Pawar*
Vik Pawar

# EXHIBIT E

# B|E|S BRAGAR EAGEL & SQUIRE, P.C.

J. Brandon Walker
885 Third Avenue
Suite 3040
New York, NY 10022
Tel: (212) 355-4648
Fax: (212) 214-0506
walker@bespc.com

January 25, 2019

**BY EMAIL AND CERTIFIED MAIL**

Caryn G. Schechtman
DLA Piper
1251 Avenue of the Americas
27th Floor
New York, NY 10020-1104
caryn.schectman@dlapiper.com

      Re:    *Akers Biosciences, Inc. Shareholder Litigation Demand*

Dear Ms. Schechtman:

I write in response to your January 24, 2019 letter informing our clients, Tiffany Chan, Jasmine Henderson, and Don Danesh Wijesekera (the "Shareholders"), who each made a litigation demand on behalf of Akers Biosciences, Inc. ("Akers" or the "Company") on November 2, 2018 (the "Demands"), that another purported Akers shareholder, Cale Watts ("Watts"), filed a Verified Shareholder Derivative Complaint in the United States District Court for the District of New Jersey (the "Watts Action") alleging the same conduct raised in the Demands, and that the Company has entered into a Memorandum of Understanding with Watts to resolve the dispute.

Please immediately provide the terms by which the Company has agreed to voluntarily settle the Watts Action. Based upon publicly-available information, the Shareholders are concerned that Akers may have entered into a settlement in the Watts Action for the improper purpose of avoiding an investigation into the wrongdoing alleged in the Demands, a course of conduct that may very well irreparably harm the Company.

As noted, the Shareholders' Demands were sent to Akers' Board of Directors (the "Board") on November 2, 2018, and were received on November 5, 2018.[1] The Shareholders did not receive responses to their Demands. More than two months later, on January 16, 2019, I sent a follow up letter to the Board on behalf of the Shareholders stating that no response had been received and that the Shareholders would initiate a derivative action on behalf of the Company if no response was forthcoming. To date, the Shareholders have yet to receive a response to their Demands and instead have been informed of the Notice of Settlement that was filed in the Watts Action on January 23, 2019.

---

[1] Attached please find true and correct copies of the USPS return receipts associated with the Demands.

B|E|S BRAGAR EAGEL & SQUIRE, P.C.

Ms. Schechtman
January 25, 2019
Page 2

The Watts Action was not filed until November 9, 2018, *four days after* the Board received the Demands.  Moreover, Watts does not have standing to bring a derivative suit on behalf of Akers, a New Jersey corporation, because he failed to make a pre-suit litigation demand and instead alleged that a pre-suit demand was excused as futile, in direct violation of New Jersey law. *See* N.J.S.A. 14A:3-6.3, 6.9.  The New Jersey statute, as amended January 16, 2018, states:

No shareholder may commence a derivative proceeding until:

(1) written demand has been made upon the corporation to take suitable action; and

(2) 90 days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

N.J.S.A. 14A:3-6.3.  Accordingly, the Watts Action was improperly brought and is subject to immediate dismissal.

Based on the foregoing, the Shareholders are concerned that the impending settlement in the Watts Action may not be in the best interests of the Company.  Accordingly, please provide the terms of the settlement immediately so that the Shareholders can ensure the proposed settlement is in the best interests of the Company.

Sincerely yours,

J. Brandon Walker

cc:    Timothy W. Brown, The Brown Law Firm, P.C. (via email)

Enclosures:  USPS Return Receipts for November 2, 2018 Demands

# EXHIBIT F



**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
www.dlapiper.com

Michael D. Hynes
michael.hynes@dlapiper.com
T  212.335.4942
F  212.884.8642

January 29, 2019
*Via Email Only*

J. Brandon Walker
Bragar Eagel & Squire, P.C.
885 Third Avenue, Suite 3040
New York, NY 10022
walker@bespc.com

       Re: *Akers Biosciences, Inc. Stockholder Litigation Demand*

Mr. Walker:

On behalf of Akers Biosciences, Inc. ("Akers Bio" or the "Company"), we write in response to the January 25, 2019 letter you sent on behalf of Tiffany Chan, Jasmine Henderson, and Don Danesh Wijesekera ("Your Clients").  As explained in our January 24, 2019 letter, shareholder Cale Watts filed a Verified Shareholder Derivative Complaint in the District Court of New Jersey, Docket No. 2:18-cv-15992 ("Watts Action") against Akers Bio based on the same allegations asserted by Your Clients, and the Company entered into a Memorandum of Understanding ("MOU") with Watts to resolve the dispute.

In your most recent letter, Your Clients express concern "that the impending settlement in the Watts Action may not be in the best interests of the Company."  These concerns are unfounded. Indeed, on January 10, 2018, the Company, the Company's counsel, Watts' counsel – Timothy Brown of The Brown Law Firm, shareholders' counsel in the federal securities action, *Faulkner v. Akers Biosciences, Inc., et al.*, Docket No. 2:18-cv-10521 (D.N.J.) – Phillip Kim and Leah Heifetz-Li of The Rosen Law Firm, P.A., and counsel for the Company's insurance carrier all attended a mediation before Jed Melnick at JAMS in New York City.  During the all-day session, the parties, the insurer and the mediator discussed at length all of the claims and disputes, including Your Clients' concerns, and all parties and the insurer determined that a negotiated resolution was in the best interests of their respective clients, which included the Company.  In doing so, Akers Bio and counsel for Watts entered into the MOU that included corporate governance reforms, such as the implementation of a policy regarding whistleblowers, the creation of a risk and disclosure committee, modifications to the audit committee charter, the nominating and corporate governance committee charter, and the compensation committee charter, adoption of policies regarding executive reports, and mandatory attendance of directors at annual shareholder meetings.



January 29, 2019
J. Brandon Walker
Page Two

If you need more information about the terms of the MOU, we suggest that you contact Watts'
attorney, Timothy Brown, The Brown Law Firm, P.C., 240 Townsend Square, Oyster Bay, NY
11771 (561) 922-5427, tbrown@thebrownlawfirm.net.

Respectfully,

*s/ Michael D. Hynes*

Michael D. Hynes

cc:     Caryn G. Schechtman

# EXHIBIT G

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

J. Brandon Walker
885 Third Avenue
Suite 3040
New York, NY 10022
Tel: (212) 355-4648
Fax: (212) 214-0506
walker@bespc.com

February 1, 2019

**BY EMAIL ONLY**

Michael D. Hynes, Esq.
Caryn G. Schechtman, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
michael.hynes@dlapiper.com
caryn.schechtman@dlapiper.com

      Re:    *Akers Biosciences, Inc. Shareholder Litigation Demands by Tiffany Chan,*
             *Jasmine Henderson, and Don Danesh Wijesekera (the "Shareholders")*

Dear Mr. Hynes,

       I write in response to your January 29, 2019 letter stating that the Shareholders' concerns that the proposed settlement of *Watts v. Gormally*, 18 Civ. 15992 (D.N.J. Nov. 9, 2018) (the "Watts Action") is not in the best interests of the Company is unfounded. As with my January 24, 2019 letter, I have copied Timothy W. Brown of The Brown Law Firm, P.C. on this letter.

       Your January 29 letter fails to address the Shareholders' concerns. Namely, you have not stated whether Akers Biosciences, Inc.'s ("Akers") Board of Directors was presented with the Shareholders' demands or whether the Board or any Special Committee of the Board has conducted any investigation into the facts set forth in the demands. More troubling is that Akers chose to mediate a settlement of the Watts Action despite Watts's failure to make a pre-suit litigation demand on the Board, as required by New Jersey law. *See* N.J.S.A. 14A:3-6.3. Because Watts had no standing to bring his claim, he can have no standing to settle his claim, much less any claims that the Shareholders might bring on behalf of the Company. Further, because Watts lacked standing, he had no incentive to provide zealous representation on behalf of Akers. Akers' decision to negotiate with Watts, while ignoring the demands, strongly suggests that Akers was looking for an easy – and cheap – way to avoid scrutiny into the wrongful acts detailed in the demands. This course of action may cause irreparable harm to Akers. You are no doubt aware that courts have become increasingly diligent in scrutinizing settlements of representative actions for collusion.

       The Notice of Settlement filed in the Watts Action on January 23, 2019, represents that the parties "entered into and executed a Memorandum of Understanding on or about January 14, 2019" (the "MOU"). Please provide us with a copy of the MOU or confirm to Mr. Brown that you have no objection to him providing us with a copy.

B|E|S  BRAGAR EAGEL & SQUIRE, P.C.

Michael D. Hynes, Esq.
Caryn G. Schechtman, Esq.
February 1, 2019
Page 2

I look forward to receiving a copy of the MOU, whether from DLA Piper or Mr. Brown. Please also send documentation concerning the Board's investigation of the Shareholders' demands, if any.

Sincerely yours,

J. Brandon Walker

cc:     Timothy W. Brown, The Brown Law Firm, P.C. (via email)